660 A.2d 1046

**William B. DULANY, Personal Representative of The Estate of Mabel Chrest Meredith**

v.

**Jeannette TAYLOR, et al.**

**No. 1592, Sept. Term, 1994.**

Court of Special Appeals of Maryland.

July 3, 1995.

J. Brooks Leahy (Dulany & Leahy, on the brief), Westminster, for appellant.

Thomas F. Stansfield, Westminster, and Lawrence A. Melfa (Samuel M. Grant and Howard, Butler & Melfa, on the brief), Towson, for appellees.

Argued before CATHELL, SALMON, JJ., and JOHN J. GARRITY, Judge (Retired), Specially Assigned.

SALMON, Judge.

Mabel C. Meredith died on February 28, 1994 at age 94. She left an estate of over two million dollars and, in her will, named William B. Dulany as her personal representative. Soon after the Meredith will was probated, appellees, Jeannette Taylor and Ann Dumler, filed, in the Orphans Court for Carroll County, Maryland, claims against the estate. As explained in their separate Petitions for Allowance of Claim(s), $25,000 was alleged to be owed to each of the appellees because, on May 18, 1987, the decedent had "appropriately

given" each of them the sum of $25,000 "as evidenced by ... check[s] attached...." [1] Mr. Dulany denied the claims.

The three-member Orphans Court for Carroll County, on August 30, 1994, conducted a hearing regarding the validity of appellees' claims. On September 12, 1994, the Orphans Court, without stating its reasons, issued an order allowing both claims. This timely appeal followed.[2]

Appellant presents the first question listed below.[3] Appellees present questions 2 and 3.

1. Did receipt of a check by each appellee in May 1987, drawn on decedent's personal checking account, which at no time had sufficient monies to cover the checks, represent a completed gift enforceable against decedent's estate?

2. Did the Orphans Court err in holding that the decedent intended to complete the gifts, where such a holding may be affirmed upon well-recognized equitable principles, as the ultimate completion of the gifts failed only because of the appellant's conduct?

3. Would it have been an error for the Orphans Court to rely upon the doctrine of constructive trust, as it would be inequitable for the estate to retain the funds largely because of the conduct of the appellant?

## BACKGROUND

Mabel Meredith, on April 29, 1986, executed a broad form power of attorney appointing her long-time personal attorney,

---

**1.** While the appellees filed separate petitions, except for the name of the claimant, the petitions were substantially identical.

**2.** Md.Code (1974, 1995 Repl.Vol.), § 12–308 of the Cts. & Jud.Proc. Article, with exceptions not here applicable, as between the Maryland Courts of Appeal, grants this Court initial appellate jurisdiction over any reviewable judgment of an Orphans Court. Section 12–501, however, permits a party to appeal an Orphans Court judgment to the circuit court (except in Harford and Montgomery Counties).

**3.** Appellant also raises the issue of whether appellees' claims were barred by the doctrine of laches, which we need not decide.

William B. Dulany, as her attorney-in-fact. The power of attorney was revocable and concurrent in that it did not prevent Ms. Meredith from handling her own affairs. Therefore, nothing in the power of attorney prevented Ms. Meredith from writing checks or making gifts.

On December 15, 1986, Ms. Meredith was eighty-seven years old and living in a nursing home. On that date, Ms. Meredith signed a letter requesting Mr. Dulany to "proceed to act for me" under the April 29, 1986 power of attorney. Soon thereafter, Mr. Dulany began to investigate and found Ms. Meredith's financial affairs to be in disarray. Mr. Dulany discovered

> stock certificates on the floor in her home, cash all over the house, bank books, certificates, E–Bonds, and it seemed like that every time she got mail she just put it in a plastic bag like an A & P bag and hung it on a doorknob.

On December 30, 1986, Mr. Dulany sent notices to all banks in which Ms. Meredith held accounts, advising that he was handling her financial affairs and asking that the banks send all correspondence regarding her accounts to his office.

From December 1986 until her death, Ms. Meredith's mental condition varied—at times she was quite competent and at other times she was not lucid. During the last six years of her life, Ms. Meredith continuously lived in a nursing home located in Westminster, Maryland.

Jeannette Taylor (one of the appellees) met Ms. Meredith in 1971 when Ms. Meredith was convalescing from a hip injury. Ms. Taylor worked in the nursing home where Ms. Meredith was treated. After Ms. Meredith's discharge from the nursing home in the early 1970's, the two remained quite close and enjoyed, according to Ms. Taylor, a "mother-daughter-type" relationship. Ms. Meredith showed her affection for Ms. Taylor by bequeathing her $25,000 in her will and, during her life-time, made monetary gifts to her.

Ann Dumler was also a close friend of Ms. Meredith. Although she lived in Salisbury, Maryland, she frequently

visited Ms. Meredith in Westminster. She too was bequeathed $25,000 in Ms. Meredith's will.[4]

On May 14, 1987, Ms. Taylor picked up Ms. Meredith at the nursing home where she resided. Ms. Taylor told the nurses at the home that she was going to take Ms. Meredith "out for ice cream." Ms. Taylor proceeded to drive Ms. Meredith to the Carroll County Bank and Trust Co. where Ms. Meredith had an account with a balance of $96,372.87. Ms. Taylor advised bank officers that Ms. Meredith was worried about (FDIC) insurance coverage on the account and also that Ms. Meredith wished to put Ms. Taylor's name on the account. A bank official called Mr. Dulany's office and talked to Karen Bosley, a lawyer employed in that office. The bank official advised Ms. Bosley that she would try to convince Ms. Meredith to transfer the account to an agency account—where the monies would be invested in tax-exempt bonds. Ms. Bosley told the bank representative that this was agreeable but advised that the bank could not refuse the request to close the account or put Ms. Taylor's name on it if Ms. Meredith insisted. The bank official called back later that day and advised Ms. Bosley that Ms. Meredith had been convinced that she should transfer the account to an agency account and that Ms. Meredith seemed satisfied with this new arrangement. Ms. Taylor's name was not added to the new account.

Four days later, on May 18, 1987, Ms. Taylor again visited Ms. Meredith at the nursing home. On that morning, Ms. Meredith wrote two checks, each drawn on the Westminster Bank and Trust Company (Westminster Trust) and each in the amount of $25,000. One check was payable to Ms. Taylor, and the other was made to Ann Dumler. Under the memo portion on each check, Ms. Meredith wrote the word "gift." Ms. Taylor thereafter left the nursing home and drove immediately to the drawee bank to present her check for payment. An employee of Westminster Trust advised that Ms. Meredith's account had insufficient funds to cover the check. Ms.

---

4. The will bequeathing Ms. Dumler and Ms. Taylor $25,000 each was executed on April 24, 1986.

Taylor then drove back to the nursing home and told Ms. Meredith that her check did not clear. Ms. Meredith forthwith wrote a letter to Westminster Trust asking them to advise her as to her checking and savings account balances. Ms. Taylor then hand delivered the letter to the Westminster Trust on the morning of May 18, 1987.

Westminster Trust wrote a note to Ms. Meredith stating that her checking account balance was $1,565.89, and her savings balance was $19,445.21. Ms. Taylor delivered this note to Ms. Meredith at the nursing home. Later on May 18, 1987, Ms. Taylor drove Ms. Meredith to the Carroll County Bank and Trust Co. Upon arrival, Ms. Meredith gave Ms. Taylor a letter addressed to the bank asking the bank to let her know the balance in her accounts. Ms. Meredith waited in the car while Ms. Taylor delivered this letter. The bank wrote on the bottom of the letter that Ms. Meredith had $982.28 in her checking account and $97,134.76 in Account No. 119–0637–7, which was the new agency account [5] opened only four days earlier. A bank teller then delivered this information to Ms. Meredith. A conversation between the bank teller and Ms. Meredith then ensued. As shown by the following colloquy (between counsel for appellee Dumler and Ms. Taylor), it is difficult to know exactly what was said in that conversation.

Q: All right. And what happened when the teller came out? Once again, don't say anything that Mrs. Mabel Meredith said. What happened out there?

[MS. TAYLOR]: Well, there was, a statement was made like—well, it's hard not to use—

Q: You don't have to say what, if anything, Mabel did or did not say. I'll ask you a question. Was she allowed to make the withdrawal?

A: No.

Q: Why not?

---

5. The old account, which had a balance of $96,372.87, was Account No. 028–0967–2.

A: Well, it came about to where we had to get in touch with—it was better if she got in touch with Mr. Dulany as far as that.

Q: Were you told that Mr. Dulany had control of Mabel Meredith's account and that no withdrawals could be made?

A: It wasn't put in that way, but—

Q: Well, what way was it put?

A: Let me think here a minute. It was put in a way—what was going to be done was money was going to be transferred in, from one account into another to where the checks would be made good. But we waited about 10 or 15 minutes for the teller to come out and then she informed us that—

Q: She came out a second time?

A: She came out and—yup. Because Mabel [Meredith] wanted the account numbers and how much was in the accounts.

Q: And why were you told the money could not be taken out of Carroll County?

A: That Mr. Dulany had power of attorney and it was best if we got in touch with him.

Ms. Meredith thereafter never asked Mr. Dulany to take any action regarding the two $25,000 gift checks. Prior to Ms. Meredith's death, Ms. Taylor spoke to Mr. Dulany about the check. Mr. Dulany's notes indicate that this conversation occurred on May 20, 1987 and that Ms. Taylor told him that she had taken Ms. Meredith to the Carroll County Bank and Trust Co. and that she had tried to get Ms. Meredith to call Mr. Dulany about the checks. Ms. Taylor also told Mr. Dulany that she had taken Ms. Meredith to Westminster Trust, but "there was nothing" at the bank. There was no evidence presented to the Orphans Court as to what Mr. Dulany told Ms. Taylor when he received this information. Moreover, there is nothing in the record to show what Mr. Dulany said when he talked about the checks (to Ms. Taylor)

on other occasions.[6] Furthermore, there was no evidence presented to the Orphans Court that, prior to Ms. Meredith's death, either appellees, or anyone acting on their behalf, had ever asked Mr. Dulany to transfer funds or to take any other action to make certain the checks would be honored.

Ann Dumler had received her $25,000 check, by mail, on May 21, 1987. At Ms. Meredith's request, it had been sent to Ms. Dumler by Ms. Taylor. About the time of receipt of the check, however, Ms. Dumler was advised by Ms. Taylor that there were insufficient funds to cover it. Ms. Dumler never talked to Mr. Dulany about the check. A few weeks after receiving her check, Ms. Dumler was phoned by Ms. Taylor and told that Mr. Dulany "knew about the checks" and he had asked Ms. Meredith to "get the check back." Ms. Dumler hand delivered the check to Ms. Meredith at the nursing home hoping that Ms. Meredith "could get something done to make the check good." Ms. Meredith put the check in a book where she kept personal notes. In September 1987, one of Ms. Meredith's nurses discovered the Dumler gift check in the book and mailed it to Mr. Dulany. The Dumler check remained in Mr. Dulany's possession until the Orphans Court hearing on August 30, 1994.

According to Mr. Dulany's testimony, he spoke to Ms. Meredith about the gift check once—on July 4, 1987. On that day, Mr. Dulany visited Ms. Meredith at the nursing home. According to Mr. Dulany's notes of that meeting, Ms. Meredith repeated herself frequently at the meeting and was under

6. When asked about her conversation with Mr. Dulany, Ms. Taylor's answer was ambiguous. Ms. Taylor and counsel for Ann Dumler had the following exchange:

> Q: Did you ever—did you ask Mr. Dulany about the check?
> [MS. TAYLOR]: Mr. Dulany was aware of the checks.
> Q: Well, how do you know that?
> A: Because I had talked to him. But see, Mabel, I had been taking Mabel [Meredith] a couple of times to the bank because there was things that she wanted to do but she just couldn't do it because it was like get in touch with Mr. Dulany, you know, you [Ms. Meredith] need to talk with your attorney.

There is no other indication in the record as to what else may have been said in the conversation between Mr. Dulany and Ms. Taylor.

the impression that people had been stealing personal items from her while she slept. To prevent theft, Ms. Meredith removed her clothing to the bathroom.

Ms. Meredith recalled that on May 18, 1987 she had written the two checks here at issue. Mr. Dulany's written notes (in regard to what Ms. Meredith told him about the checks) read:

On May the 18th she wrote two checks on Westminster Trust, one for Ann Dumler for 25,000, and one to Jeannette Taylor for 25,000. Taylor bought a place across Maryland line, needed down payment. Does not know herself, does not know how she was [sic]. Thinks at one time she had $90,000 in this account. Jeannette [Taylor] had a chance to buy property across the Maryland line. She does not seem to recall giving Ann Dumler $25,000. She says they must have cleared. She says she will not draw any more checks except when she needs 5 or $10 or such.

In his testimony, Mr. Dulany recalled that Ms. Meredith told him she thought the checks "might have cleared." Mr. Dulany was unable to remember whether he then told Ms. Meredith that the checks had not cleared.

Additional facts will be set forth in order to discuss the issues presented.

## I. Validity of the "Gifts"

■ The appellees asserted in their Petitions for Allowance of Claims that the estate owed them money because the decedent, Ms. Meredith, had made gifts to them of $25,000 each. Likewise, in arguing their case to the three non-lawyer members of the Carroll County Orphans Court, appellees gave only one reason why the Meredith estate owed them money— that she had made a valid gift. Appellant contended below, and before us, that there was no completed gift made to appellees because "personal checks not honored are incomplete gifts as a matter of law." We agree.

In *Malloy v. Smith,* 265 Md. 460, 463, 290 A.2d 486 (1972), the donor (William Malloy) withdrew $400 from his joint savings account in the form of a *manager's (or cashier's) check*

paid to the order of himself. Mr. Malloy then endorsed the check to two of his children and placed the check, passbook, and a sum of cash into an envelope and gave it to a friend with instructions to deliver the envelope should "something happen[ ] to [me]." *Malloy* at 462, 290 A.2d 486. One week after Malloy's death, the friend delivered the envelope to Malloy's son who cashed the check. Mr. Malloy's widow brought suit alleging that there was no valid gift *causa mortis* and contending that there was no delivery because a "check cannot be the subject of a valid gift *causa mortis*."

The *Malloy* Court noted, in *dicta*, that, in the case of a donor's own personal check, unlike a cashier's check, valid delivery does not complete the gift. To perfect the gift when a personal check is used, the check must be presented by the donee and accepted by the drawer bank. In the case of a cashier's check, however, the funds are no longer subject to the control of the donor, but are "converted into an obligation of the bank and a bank check drawn to the donee's order is no more subject to recall by the donor than would be a bearer bond or currency, if effective delivery is made." *Malloy*, 265 Md. at 463, 290 A.2d 486.

In *Metzger v. Comm'r of the I.R.S.*, 38 F.3d 118 (4th Cir.1994), the Fourth Circuit, in the context of an estate gift tax dispute, discussed Maryland law regarding the validity of a gift. In *Metzger*, one of the issues presented was whether "noncharitable gifts in the form of checks are complete for federal gift tax purposes at the time of the unconditional delivery and deposit of the checks, or when the checks were actually honored by the drawee bank." *Id.* at 119. Pursuant to a power of attorney, John Metzger wrote four checks, drawn on his father's account, payable to the order of himself and three others. The checks at issue were deposited by John Metzger and his wife on December 31, 1985 but the checks did not clear until January 2, 1986. In *Metzger*, the first issue presented was whether the checks to John Metzger and his wife were gifts for the year 1985 (the year the checks were deposited) or 1986 (the year the checks were honored).

On appeal, the Fourth Circuit looked to Maryland law to determine when the donor relinquished dominion and control over the checks. The Court, citing *Malloy v. Smith*, 265 Md. 460, 290 A.2d 486, 487–88 (1972), and *Ward v. Federal Kemper Ins. Co.*, 62 Md.App. 351, 489 A.2d 91 (1985),[7] stated that "under Maryland law, the delivery of a personal check is only conditional payment, and the gift remains incomplete until the donee presents the check for payment and the check is accepted by the drawee bank." *Metzger*, 38 F.3d at 121. The Court determined that the gift was made in 1986, the date when the bank accepted the check and debited the funds from the account.[8]

The Supreme Court of Kansas addressed an issue identical to the one here presented in the case of *In re Brown's Estate*, 159 Kan. 408, 155 P.2d 445 (1945). In that case, Mr. Brown presented a hospital with a gift check for $10,000. When the hospital administrator deposited the check, it was returned for insufficient funds. Mr. Brown died prior to payment of the check, and no provision was made in his will for payment. The Court held that the hospital had no valid claim against the estate as the mere delivery of a personal check to another is

---

7. *Ward v. Federal Kemper Ins. Co.*, 62 Md.App. 351, 489 A.2d 91 (1985) (holding that there was an improper cancellation of insurance policy for nonpayment of premium). In *Ward*, a check was sent to the insured due to an overpayment of an insurance premium. The check was never negotiated by payee. Upon discovery by the insurance company that there had been an overpayment in the refund, the company sent a bill to the insured for the difference. Upon failing to receive the difference from the insured, the insurance company cancelled the insurance policy and refused to provide insurance for a collision that occurred after such cancellation.

    The *Ward* Court stated that the check was never presented nor paid by the drawee bank, "so the funds it represented were never transferred to [the payee]." *Ward* at 359, 489 A.2d 91. Therefore, the overpayment premium was still in the control of the payor due to non-negotiation of the instrument at the time of cancellation. Thus, the cancellation was improper.

8. The Court went on to hold that, for tax purposes, however, under the "relation back doctrine," the date of the gift relates back to the date the checks were deposited not the date the bank honored the checks. *Metzger* at 123.

not a valid gift because it is revocable prior to acceptance of payment by the drawee bank and is revocable upon the death of the donor.

The case of *Zehner v. Zehner's Estate,* 74 Ind.App. 334, 129 N.E. 244 (1920), is also apposite. In *Zehner,* the decedent executed a check for $3,000 to the payee for the purpose of educating the payee's son. The payee presented the check for payment, but it was returned for insufficient funds. The decedent died before the check was made good. The *Zehner* Court held that, although the facts showed that the check was delivered as a gift, the parties could not proceed in an action against the estate as there was no valuable consideration given for the gift.

Several secondary sources have addressed the issue as to whether a personal check presented, but never paid, during the life of the donor is a valid gift. Each of these sources say, in effect, that the uniform rule as applied in all common law jurisdictions is that a personal check is not a valid gift unless it is paid during the decedent's lifetime. *See,* Annotation, *Donor's Own Check as Subject of Gift,* 38 A.L.R.2d 594 (1954);[9] *see also,* 38 Am.Jur.2nd *Check Presented But Not Paid During Donor's Lifetime* §§ 67 and 68 (1968);[10] 38

---

9. The annotator states, 38 A.L.R.2d 594 at 615:

   [T]he cases are quite uniform in holding that even though a donor's check has been presented for payment prior to his death, it does not constitute a valid gift if not paid during his lifetime; and this appears to be the rule notwithstanding payment was refused for an erroneous reason. Citing *Edwards v. Guaranty Trust & Sav. Bank,* [47 Cal. App.86] 190 P. 57 (1920); *Roney v. Dunleary,* [39 Ind.App. 108] 79 N.E. 398 (1906); *Zehner v. Zehner,* [74 Ind.App. 334] 129 N.E. 244 (1920); *In Re Brown,* [159 Kan. 408] 155 P.2d 445 (1945); *Second Nat. Bank v. Williams,* 13 Mich. 282 (1865); *In Re Graud,* 43 N.Y.S.2d 803 (1943); *In Re Beaumont,* 1 Ch. 889 (1902); *In Re Swinburn,* 1 Ch. 38 (1926).

10. In § 67, Checks Presented But Not Paid or Accepted by the Drawee During Donor's Lifetime, the author summarizes:

    "Generally, the cases hold that if a check is not paid during the drawer's lifetime, it does not constitute a valid gift even though it has been presented for payment prior to his death; and this appears to be the rule although payment is refused for an erroneous reason."

C.J.S. *Donor's Own Note or Check* § 55 (1943).[11]

■ For there to be a valid *inter vivos* gift, five factors must co-exist:

1. A clear intent on the part of the donor;

2. A gratuitous, unconditional transfer of possession;

3. An immediate transfer of title;

4. A delivery of the title by the donor to the donee or his or her guardian or representative; and

5. An acceptance of the gift by the donee or his or her guardian or representative.

*Rudo v. Karp,* 80 Md.App. 424, 429, 564 A.2d 100 (1989).

Ms. Meredith's personal checks did not clear during her lifetime. Assuming, *arguendo,* that appellees proved other factors, it is clear that plaintiff did not prove factors 2, 3, and 4. Ms. Meredith did not make a valid gift to appellees. Therefore, we answer "no" to the first question presented.

---

In § 68, the annotator says:
It would also appear to be clear from the general rule itself—namely, that the donor's check, prior to payment *or acceptance* by the bank, is not the subject of a valid gift—that a check certified during the donor's lifetime may be the subject of a valid gift inasmuch as certification constitutes acceptance of a check by the drawee.

11. *Checks*—As in the case of a note, the gift of the donor's own check is but the promise of a gift and does not amount to a completed gift until payment or acceptance by the drawee.... The gift of a check becomes complete when, in the donor's lifetime, it is paid, certified, or accepted by the drawee, or negotiated to a third person, or where the banker has delayed payment to investigate the signature, and delivery of a check drawn on the trustee in trust to a bank, payable after the settlor's death from the proceeds of bonds delivered to the trustee, creates a valid gift. Citing *Dailey v. Adams,* [229 Ark. 571] 319 S.W.2d 34 [(1958)]; *Holsomback v. Akins,* [134 Ga.App. 543], 215 S.E.2d 306 [(1975)]; *Succession of Schneider,* 199 So.2d 564 [(La.App.)] *application den.* [251 La. 34] 202 So.2d 652 [(La.1967)]; *Malloy v. Smith,* 265 Md. 460 [290 A.2d 486] [(1972)]; *Straut v. Hollinger,* [139 N.J.Eq. 206] 50 A.2d 478 [(1947)]; *In re Seyffert's Estate,* [20 Misc.2d 799] 192 N.Y.S.2d 148 [(1959)].

## II. *Constructive Delivery*

In *Hamilton v. Caplan*, 69 Md.App. 566, 573, 518 A.2d 1087 (1987), we stated:

"The validity of the alleged gifts depends upon the legal sufficiency of the deliveries." *Schenker v. Moodhe*, 175 Md. 193, 196 [200 A. 727] (1938). Delivery may be actual or constructive, but in either case must place the gifted property beyond the dominion and control of the donor and within the dominion and control of the donee. *Id.* at 196–97 [200 A. 727]. The Court of Appeals explained:

To be valid, a constructive delivery must not only be accompanied by words sufficient to show a donative intent, but must be of such a character as to completely divest the donor of dominion and control over the donation and to place it "wholly under the donee's power." *Id.* at 197 [200 A. 727] (citations omitted).

The cases in which constructive delivery has been found involved circumstances where the donor thought he had done all he could do to relinquish dominion and control over the donated item. *Malloy v. Smith*, 265 Md. 460, 466 [290 A.2d 486] (1972). The concept of constructive delivery evolved from the gift of items too difficult to deliver physically, such that the only practicable way to deliver the item was symbolically. *See In re Brown's Estate*, 343 Pa. 230 [22 A.2d 821] (1941).

Appellees contend that there was "constructive delivery" of the "gifts" to appellees; hence, the "gifts" were valid. According to appellees, the constructive delivery doctrine is applicable because the donor (Ms. Meredith) "had done all that she thought was possible in order to complete the gifts." The short answer to this contention is that there was no evidence to show that Ms. Meredith "thought" she had done all that was possible to complete the gifts. She was never quoted as having said that. Moreover, there was no evidence from which it could properly be inferred that Ms. Meredith entertained that thought. The evidence is uncontroverted that on May 18, 1987 she was aware that the checks had been

returned for insufficient funds. There was evidence (albeit somewhat vague) that on May 18, 1987 Ms. Meredith attempted to withdraw $50,000 from the Carroll County Bank and Trust Co. so that she could deposit that amount in Westminster Trust and make the checks good. The Carroll County Bank and Trust Co. employee, who dealt with Ms. Meredith, apparently told Ms. Meredith "that it [would be] best if she talked to Mr. Dulany" before making the large transfer. Mr. Dulany testified without contradiction that he would have transferred the funds necessary to make the checks good, if Ms. Meredith ever asked him to do so and if she was lucid when she made the request. Appellees presented no evidence from which it could be found that Ms. Meredith ever asked Mr. Dulany to make a transfer of funds or to take any other action to make the checks good. In sum, Ms. Meredith took no action to give up her dominion and control over the $50,000.

Even if we assume, *arguendo*, that Ms. Meredith thought she had done all she could do to make the gift, appellees' position would not be improved.

As pointed out in *Hamilton, supra,* to be a valid constructive delivery the donor must not only use words showing donative intent, but the words used must divest the donor of dominion and control over the donation and place the donation "wholly under the donee's power." Here the putative "gifts" were never under the donees' control.

Appellees argue that the gift failed only because of "appellant's" conduct. By "appellant," appellees mean Mr. Dulany, individually. Mr. Dulany, individually, is not a party to this appeal. Even assuming Mr. Dulany "caused" the gift to fail, appellees point to no principle of law that would, under the circumstances of this case, make the Meredith estate liable for his individual actions.

Appellees' brief contains a host of criticisms regarding Mr. Dulany's conduct. Conspicuously absent, however, is any reference to evidence that Mr. Dulany breached any duty he owed to Ms. Meredith. The "gifts" here at issue failed because Ms. Meredith never relinquished her dominion and

control over the donation. Mr. Dulany obviously had no right to transfer funds (to complete a gift) unless Ms. Meredith asked him to do so and, according to the evidence, she never did. There was no constructive delivery.

### III. *Constructive Trust*

■ Appellees argue that the Orphans Court's allowance of their claims should be affirmed based on the "doctrine of constructive trust." Appellees cite one case in support of their argument—*Hamilton, supra.* In *Hamilton,* 69 Md.App. at 583–84, 518 A.2d 1087, we said:

> A constructive remedy is a remedy employed by the courts to convert the holder of legal title to property into a trustee "for one who in good conscience should reap the benefits of the possession of said property." *Wimmer v. Wimmer,* 287 Md. 663 [414 A.2d 1254] (1980). The remedy is applied where property has been acquired by fraud, misrepresentation, or other improper method, or where the circumstances render it inequitable for the tile holder to retain the property. *Id.; Bowie v. Ford,* 269 Md. 111, 118–19 [304 A.2d 803] (1973); *O'Connor v. Estevez,* 182 Md. 541 [35 A.2d 148] (1943); *Springer v. Springer,* 144 Md. 465 [125 A. 162] (1924). The purpose of imposing a constructive trust is to prevent the unjust enrichment of the title holder. *Wimmer,* 287 at 668 [414 A.2d 1254]. The Court of Appeals explained in *Bowie v. Ford,* 269 Md. 111, 118–19 [304 A.2d 803] (1973):
>
>> *Constructive trusts ... are raised by equity in respect of property which has been acquired by fraud....* They arise purely by construction of equity, independently of any actual or presumed intention of the parties to create a trust, and are generally thrust on the trustees for the purpose of working out the remedy. The trusts are not what are known as technical trusts, and the ground of relief in such cases is, strictly speaking, fraud and not trust. *Equity declares the trust in order that it may lay its hand on the thing and wrest it from the possession of the wrongdoer.*

*Eisinger Mill Etc. Co. v. Dillon,* 159 Md. 185, 191 [150 A. 267] (1930).

(Emphasis added).

First of all, the money here at issue was not *acquired* by the Meredith estate by fraud, misrepresentation, or other improper methods. At all times here relevant, the monies at issue belonged to the estate. Second, there was no evidence presented showing that it would be inequitable for the estate to retain this money. Appellees did not, in any sense, earn the money and therefore there is no element of unjust enrichment. Lastly, because there was no evidence that the estate was a "wrongdoer," there is no reason why equity should "wrest" the money from the possession of the estate.

In the portion of their brief dealing with the allegation that the Orphans Court could have allowed the claims on a constructive trust theory, appellees again claim that Mr. Dulany, individually, was somehow a "wrongdoer." There is not a soupcon of evidence in this record that Mr. Dulany did, or failed to do, anything "wrong" or unethical in his handling of Ms. Meredith's affairs that would allow a court to grant a constructive trust against the Meredith estate. Appellees' arguments to the contrary are simply not supported by the record.[12] For these reasons, the doctrine of constructive trust is inapplicable.

---

**12.** Appellees attribute the following "wrongs" to Mr. Dulany:

A) He allegedly improperly ordered the banks not to cooperate with Ms. Meredith in her efforts to transfer funds to make the checks good. There is no such evidence.

B) He failed to tell the Carroll County Bank and Trust Co. that, under the terms of his power of attorney, Ms. Meredith had the concurrent power to transfer funds. The evidence is that Ms. Bosley, Mr. Dulany's law associate, told the bank on May 14, 1987 that, if Ms. Meredith insisted, the bank could not refuse either to close her accounts or put Ms. Taylor's name on them. Except for the May 14, 1987 conversation between Ms. Bosley and the bank, there is no evidence that any officer of any bank ever asked Mr. Dulany or his agents, either directly or indirectly, about the terms of his power of attorney. Appellees point to no professional canon, statute, or other authority that would require Mr. Dulany voluntarily to divulge such information under these circumstances.

ORDER OF THE ORPHANS COURT FOR CARROLL COUNTY, MARYLAND, ALLOWING THE CLAIMS OF APPELLEES REVERSED; COSTS TO BE PAID BY APPELLEES.

C) According to appellees, Mr. Dulany was guilty of "stonewalling" or intentionally thwarting Ms. Meredith's desire to give away $50,000 to appellees. Mr. Dulany testified that Ms. Meredith never asked him to take any action to transfer funds to make the checks good. This testimony was not contradicted. Mr. Dulany was under no duty to transfer the funds unilaterally.