940 A.2d 1137

DEPARTMENT OF JUVENILE SERVICES

v.

Leonard MILEY.

No. 0284, Sept. Term, 2007.

Court of Special Appeals of Maryland.

Feb. 1, 2008.

Kendra Y. Ausby (Douglas F. Gansler, Atty. Gen. on the brief), Baltimore, for Appellant.

H. Victoria Hedian (Abato, Rubenstein & Abato, PA on the brief), Baltimore, for Appellee.

Panel: DEBORAH S. EYLER, ADKINS and MEREDITH, JJ.

MEREDITH, Judge.

A State employee succeeded in having his termination rescinded by an administrative law judge who concluded that the appointing authority had not met its obligation to "give the employee a written notice of the disciplinary action to be taken" within 30 days, as required by Maryland Code (1993, 2004 Repl.Vol.), State Personnel and Pensions Article ("SPP"), § 11–106(a)(5). Both the administrative law judge ("ALJ") and the Circuit Court for Baltimore City interpreted the statute to require that, in order to terminate a State employee for misconduct, the employee must *receive* notice of the termination within the 30–day time limit imposed by SPP § 11–106(b). Because the termination notice in this case was mailed on the 30th day and received on the 31st day, it was ruled untimely. The employer appeals, arguing that it complied with the statute by *mailing* the notice on the 30th day, and that it properly terminated the employee within 30 days. For the reasons that follow, we conclude that mailing the notice on the 30th day did not satisfy the employer's obligation to give a written notice of the discipline before imposing the discipline. We therefore affirm the judgment of the circuit court.

## Statement of Facts and Procedural History

Leonard Miley, the appellee, was a Resident Group Life Manager at the Thomas J.S. Waxter Children's Center, run by the Department of Juvenile Services ("DJS"), the appellant. On February 1, 2006, an incident occurred that involved Miley

and one of the youths at the center. The facts found by the ALJ were as follows:

2. On February 1, 2006, [Miley] was working at the Thomas J.S. Waxter Children's Center in Laurel, Maryland.

3. During an organized movement of female youth in the facility, one of the youths, W.C., became loud and boisterous, and was acting in a disruptive manner.

4. [Miley] separated the youth from the rest of the group and guided her to the "tour office" where there are individual confinement rooms.

5. The youth continued to act in a disorderly manner[,] striking [Miley] and knocking his eyeglasses from his face, damaging them and scratching [Miley's] face in the process.

6. The youth continued to repeatedly strike [Miley]; two female staff members responded to his location to assist in controlling the youth.

7. Even after the two additional staff members took over control of the youth and had her somewhat controlled, the youth had a grip on [Miley's] shirt collar and would not let him loose. The other staff members finally pried [Miley] from the youth's grasp.

8. Even after the two additional staff members had assumed control of the situation, the youth was able to kick [Miley] in the groin area, and spit directly in his face.

9. [Miley] became upset and clenched his fists; the other staff members persuaded him to leave the area.

10. At no time did [Miley] strike the child.

11. This incident was witnessed by Katherine Perez, Director of the Office of Independent Juvenile Service Monitors, and her assistant, Kimberly Bones.

12. Ms. Perez's and Ms. Bones' view of the area in the confinement room was through a window in "the cage" and much of the view was obstructed. They were

unable to clearly see all of the activities actually occurring in the room.

13. The incident was reported to DJS, as well as to the Department of Social Services and the Maryland State Police on February 1, 2006.

14. Gerald D. Sullivan, an Investigator with the DJS Office of Professional Responsibility and Accountability ("OPRA"), Investigations and Child Advocacy Unit, began an investigation on February 1, 2006.

15. On February 1, 2006, Mr. Sullivan interviewed [Miley] and several of the other witnesses.

16. The Investigator completed his report, concluding that [Miley's] behavior had not been in compliance with the established procedures.

17. On February 28, 2006, [Miley] met with Reginald C. Garnett, Superintendent of Cheltenham Youth Facility and Gregory McDowell, Assistant Superintendent, to present a memorandum containing information [Miley] wished DJS to consider before determining whether to take disciplinary action and if it elected to do so, in deciding what action to impose.

18. On March 2, 2006,[*] Carl V. Sanniti, Deputy Secretary, and Kenneth D. Montague, Jr., Secretary of DJS, signed a Notice of Termination, advising [Miley] that his employment was terminated effective with the close of business on March 3, 2006.

[*ALJ's footnote 3:] Although the signature date is listed as March 2, 2006, the space for "Notice Date" was left blank.

19. At some time on Friday, March 3, 2006, DJS mailed to [Miley] the Notice of Termination, along with a cover letter advising him of the decision and explaining his appeal rights.

The Notice of Termination included the following finding of misconduct that, DJS concluded, warranted termination:

The Department's investigation regarding the allegations made against Leonard Miley, DJS Resident Group Life Manager I, has clearly established that his actions on February 1, 2006, towards W.C., Resident, including clenching his fingers into a fist, jumping on W.C.'s bed at the time that W.C. was being restrained by Ms. Hudson–Willies and Ms. Willoughby, and attempting to hit and or hitting W.C., Resident, was intentional conduct without justification that seriously threaten the workplace; and unwarrantable excessive force in his treatment towards W.C., Resident, an individual in the care, and custody of the State of Maryland, Department of Juvenile Services. Mr. Miley was guilty of conduct toward W.C., Resident, including clenching his fingers into a fist, jumping on W.C.'s bed at the time that W.C. was being restrained by Ms. Hudson–Willies and Ms. Willoughby, and attempting to hit and or hitting W.C. Resident, that has brought or if publicize[d,] would bring the State into disrepute.

Mr. Miley willfully made false verbal and written reports regarding his actions towards W.C., Resident, on February 1, 2006. Mr. Miley engaged in actions toward W.C., Resident, including clenching his fingers into a fist, jumping on W.C.'s bed at he time that W.C. was being restrained by Ms. Hudson–Willies and Ms. Willoughby, and attempting to hit and or hitting W.C., Resident, were violations of the lawful orders given by his superiors pertaining to the use of force towards residents.

Mr. Miley's actions toward W.C., Resident, on February 1, 2006, including clenching his fingers into a fist, jumping on W.C.'s bed at the time that W.C. was being restrained by Ms. Hudson–Willies and Ms. Willoughby, and attempting to hit and or hitting W.C., Resident, caused a potential breach of security by jeopardizing the safety and security of Ms. Hudson–Willies, Ms. Willoughby, and W.C., Resident.

Mr. Miley's actions toward W.C., Resident, on February 1, 2006, including clenching his fingers into a fist, jumping on W.C.'s bed at the time that W.C. was being restrained by Ms. Hudson–Willies and Ms. Willoughby, and attempting to

hit and or hitting W.C., Resident[,] warrant termination of his employment with the Department of Juvenile Services.

For the purpose of this appeal, the critical dates are the following. On February 1, 2006, the appointing authority acquired knowledge of the alleged misconduct. After investigating the alleged misconduct and meeting with the employee, the Secretary of DJS signed a notice of termination on March 2, 2006 (which was the 29th day after February 1, 2006). The notice said that Miley's termination would be effective at the close of business on March 3, 2006. The notice of termination was mailed by DJS on March 3, 2006 (the 30th day after the incident), and was not received by Miley until March 4, 2006 (the 31st day after the incident).[1]

Miley appealed his termination, and the matter was referred to the Office of Administrative Hearings, pursuant to SPP § 11–110, which provides in subsection 11–110(d)(3): "The decision of the Office of Administrative Hearings is the final administrative decision." Miley contended that his termination was arbitrary and capricious, and that DJS had not complied with SPP § 11–106 because he did not receive his notice of termination within 30 days of the incident. DJS argued that the termination was justified, and that the statute required only that the notice of termination be mailed—not received—within 30 days. The ALJ found that the termination was invalid because it had not been imposed in a timely manner, holding that the Court of Appeals's decision in *WCI v. Geiger*, 371 Md. 125, 807 A.2d 32 (2002), required that all steps prior to and including termination occur within 30 days of the incident, which meant that Miley should have *received* the notice of termination before 30 days had elapsed. The ALJ

---

1. The ALJ found that Miley's testimony that he received the notice on or after March 4, "was not refuted or rebutted." The ALJ also noted that "it is reasonable to infer from Management's failure to produce the [notice's] delivery record that the information contained in that record was consistent with [Miley's] position." In his brief in this Court, Miley asserts in his Statement of Facts: "DJS mailed the Notice of Termination on March 3, and [Miley] received it on March 4."

rescinded the termination and ordered that Miley be reinstated with back pay.

DJS sought judicial review in the Circuit Court for Baltimore City, which affirmed the final decision of the ALJ. The circuit court was persuaded that the ALJ's interpretation of the notice requirement was correct because it followed the "general rule" that, where the statute does not specify the method of service, notice is deemed to have been given on the date that such notice is received. DJS timely appealed to this court.

### Analysis

On appeal, we review the decision of the agency—in this case, the decision of the ALJ—not that of the circuit court. *Department of Health and Mental Hygiene v. Campbell,* 364 Md. 108, 123, 771 A.2d 1051 (2001). Our role is "limited to determining if there is substantial evidence in the record as a whole to support the agency's findings and conclusions, and to determine if the administrative decision is premised upon an erroneous conclusion of law." *Maryland–National Capital Park and Planning Comm'n v. Anderson,* 395 Md. 172, 180–81, 909 A.2d 694 (2006) (citations omitted). In reviewing the agency's decision, we must respect the agency's expertise in its own field, and we are mindful that "an administrative agency's interpretation and application of the statute which the agency administers should ordinarily be given considerable weight by reviewing courts." *Maryland Aviation Admin. v. Noland,* 386 Md. 556, 572, 873 A.2d 1145 (2005) (citations omitted).

The statute at issue here, SPP § 11–106, provides in pertinent part:

(a) *Procedure.*—Before taking any disciplinary action related to employee misconduct, an appointing authority shall:

(1) investigate the alleged misconduct;

(2) meet with the employee;

(3) consider any mitigating circumstances;

(4) determine the appropriate disciplinary action, if any, to be imposed; and

(5) give the employee a written notice of the disciplinary action to be taken and the employee's appeal rights.

(b) *Time limit.*—Except as provided in subsection (c) of this section, an appointing authority may impose any disciplinary action no later than 30 days after the appointing authority acquires knowledge of the misconduct for which the disciplinary action is imposed.

The parties dispute whether the appointing authority's obligation to "give the employee a written notice" was completed when DJS mailed the notice of termination to Miley or when Miley actually received it. There are reasonable arguments supporting each side's position. Ultimately, we are persuaded that mailing the required notice on the 30th day and concurrently imposing the disciplinary action on the 30th day does not satisfy the appointing authority's obligation under § 11–106, as interpreted in *Geiger, supra,* 371 Md. at 144–45, 807 A.2d 32, to (a) impose the disciplinary action "no later than 30 days after the appointing authority acquires knowledge of the misconduct," *and* (b) "give the employee a written notice of the disciplinary action to be taken" *"[b]efore* taking any disciplinary action." (Emphasis added.)

We need not address in this case hypothetical situations in which an employee might somehow preclude timely delivery of a notice that was transmitted well before the expiration of the 30 day period. *Cf. Rockwood Casualty Ins. Co. v. Uninsured Employers' Fund,* 385 Md. 99, 116 n. 9, 867 A.2d 1026 (2005) ("In view of our holding that the statute requires actual notice, we note that in such a case, deliberate ignorance or intentional avoidance of notice is the equivalent of actual notice.") (citation omitted). Here, the agency knew, or should have known, when it mailed the notice to Miley on the 30th day, that there was no possibility of the employee receiving the notice before the expiration of the 30th day.

Miley argues that the outcome of this case is governed by a general rule of construction pertaining to statutes that include

a notice requirement. Although the Court of Appeals has observed that "a notice requirement generally imports receipt," *Grubbs v. Prince George's County,* 267 Md. 318, 323, 297 A.2d 754 (1972), the Court has also recognized that when the legislature specifically states that notice can be by registered or certified mail, it is "strongly indicative of a legislative intent that a notice sent by registered mail within the statutory period complies even though receipt occurs beyond the statutory period." *Riley v. Abrams,* 287 Md. 348, 356, 412 A.2d 996 (1980). *See also Wheeler v. Unsat. C. & J. Fund,* 259 Md. 232–33, 239, 269 A.2d 593 (1970) (interpreting statute governing claims against the Unsatisfied Claim and Judgment Fund, and concluding that requirement that claimant "give notice" of intent to assert claim "within 30 days" after insurer's denial of liability was satisfied by notice postmarked within the time period but received beyond such period).

More recent Court of Appeals cases have made plain, however, that the issue cannot be resolved by mechanical application of a "general rule," but rather, each statute must be separately analyzed and construed in the context of the applicable statutory scheme. In *Rockwood, supra,* 385 Md. 99, 867 A.2d 1026, analyzing whether a notice required by a provision in the Insurance Article was complete upon actual delivery or upon mailing, the Court held that where a statute required notice to be "serve[d] on the employer, by personal service or certified mail," Md.Code (1996, 2006 Repl. Vol.), Insurance Article ("IA"), § 19–406, the term serve "implies actual receipt." *Rockwood, supra,* 385 Md. at 110, 867 A.2d 1026. Noting that "[t]he cardinal rule of statutory interpretation is to ascertain and effectuate the intention of the legislature," *id.* at 108, 867 A.2d 1026, the Court emphasized that the "legislative purpose is critical." *Id.* at 111, 867 A.2d 1026 (quoting *Kaczorowski v. Mayor & City Council of Baltimore,* 309 Md. 505, 516, 525 A.2d 628 (1987)). "The purpose, in short, determined in light of the statute's context, is the key. And that purpose becomes the context within which we apply the plain-meaning rule." *Id.* Examining the plain meaning of the words in IA § 19–406 in the context of the statutory scheme,

the Court considered dictionary definitions of "serve," such as "[t]o make legal delivery of (a notice or process) ... [t]o present (a person) with a notice or process as required by law...." *Id.* at 109, 867 A.2d 1026 (citing BLACK'S LAW DICTIONARY 1399 (8th ed.2004)). Observing that the purpose of this notice requirement was "to ensure that employers actually receive notice before coverage is cancelled, so that employers have the opportunity to secure other insurance coverage," *id.* at 111, 867 A.2d 1026, the Court concluded that, in the context of IA § 19–406, "serve" requires actual delivery. *Id.* at 121, 867 A.2d 1026. The Court stated, *id.* at 110, 867 A.2d 1026: "The term implies actual receipt. If the Legislature intended some lesser standard, it could have just required the insurer to *send* or *mail* the notice to the employer by regular mail." (Emphasis in original.)

In *Centre Ins. Co. v. J.T.W.*, 397 Md. 71, 88, 916 A.2d 235 (2007), the Court of Appeals interpreted "served" as used in another statute in the Insurance Article not to require receipt within the 30–day period. IA § 2–215(d) provides, in pertinent part:

> To take an appeal, a person shall file a petition for judicial review with the appropriate circuit court within 30 days after:
>
> > (1) the order resulting from the hearing was served on the persons entitled to receive it; . . . .

Although the Court in *Centre* acknowledged it had held in *Rockwood* that the term serve "implies actual receipt," the Court reiterated that, in each case, the interpretation is be determined by application of the general rules of statutory construction. *Centre, supra,* 397 Md. at 78–79, 84–85, 916 A.2d 235. The Court in *Centre* concluded that the term "serve" must be viewed "in the context of the statutory scheme of the Insurance Article as a whole." *Id.* at 85, 916 A.2d 235. The Court held that, "[p]laced into context with the rest of Title 2 of the Insurance Article (in particular, in context with § 2–204(c)) the term *serve,* as used in § 2–215(d)(1), does not imply actual receipt." *Id.* This is because

Title 2 defines service in IA § 2–204(c) to include "mailing it to the person at the last known principal place of business of the person," which the Court concluded reflected the clear legislative intent that service be accomplished by mailing. *Id.*

In the statute that is the focus of Miley's case, the phrase "give the employee a written notice" is not further defined by the statute, nor does it appear elsewhere in Title 11, Subtitle 1: Disciplinary Actions. Nor is the phrase "give notice" defined in BLACK'S LAW DICTIONARY (8th ed.2004). But within the definition for the noun "notice," BLACK'S states, *id.* at 1090:

> A person has notice of a fact or condition if that person (1) has actual knowledge of it; (2) has received information about it; (3) has reason to know about it; (4) knows about a related fact; or (5) is considered as having been able to ascertain it by checking an official filing or recording.

In Merriam Webster's Dictionary of Law, the relevant definitions of "give" are "to execute and deliver" and "to communicate or impart to another." *Merriam–Webster's Dictionary of Law,* Merriam–Webster, Inc. (1996), *available at* http://dictionary.lp.findlaw.com/ (search for "give"). Both of these definitions imply receipt by the other party of whatever is "given." The legal definition of a gift in other contexts requires acceptance as one of its elements. *See, e.g., Dulany v. Taylor,* 105 Md.App. 619, 631, 660 A.2d 1046 (1995). But a legally required notice is rarely viewed as a "gift," and the dictionary definitions of "give" are of little aid to our analysis of SPP § 11–106.

More helpful is the guidance provided by the Court of Appeals's decision in *Geiger, supra,* 371 Md. at 143, 807 A.2d 32, which interpreted SPP § 11–106(b). The Court noted that the legislative history of the restructured State personnel statutes reflected that one of the purposes of the statutory scheme was to further the goal that " 'each State employee . . . shall be treated with fairness in State employment.' " *Id.* at 150, 807 A.2d 32 (quoting SPP § 2–301(b)). The Court emphasized the State personnel statutes' purpose of fostering fair treatment of State employees, stating, *id.:* "Consistent

application of policy, while productive of efficiency, has significant implications as to the right each employee has to be treated fairly and is, in fact, one of the protections to which each employee expressly is entitled." The Court held that, "viewed in context, § 11–106 gives the appointing authority 30 days to conduct an investigation, meet with the employee the investigation identifies as culpable, consider any mitigating circumstances, determine the appropriate action *and give notice to the employee of the disciplinary action taken." Id.* at 144–45, 807 A.2d 32 (emphasis added). Indeed, "the statute prohibits imposition of discipline beyond that [30–day] period," because SPP § 11–106(b) imposes an "unambiguously mandatory time requirement." *Id.* at 151, 807 A.2d 32.

As we observed in *Danaher v. Dep't of Labor, Licensing & Regulation,* 148 Md.App. 139, 166, 811 A.2d 359 (2002), SPP § 11–106(a) sets forth the steps that must be completed before an appointing authority imposes discipline:

Section 11–106(a) "prescribes what must be done before imposing discipline. . . ." *Geiger,* 371 Md. at 143, 807 A.2d 32. As noted, S.P.P. § 11–106(a) provides that, "before" any disciplinary action is taken, the appointing authority "shall" follow certain procedural steps. When the word "shall" appears in a statute, it generally has a mandatory meaning.

(Citation omitted).

More recently, in *PSC v. Wilson,* 389 Md. 27, 83, 882 A.2d 849 (2005), the Court of Appeals reiterated its view that "Section 11–106 appears to be a sharp limitation on the discretion of the 'appointing authority' to discipline its employees." The Court reemphasized that the procedures required by § 11–106 are mandatory, stating:

Some cases have discussed the rationale and importance behind § 11–106 and its comprehensive scope. In *Maryland Reception, Diagnostic & Classification Center v. Watson,* 144 Md.App. 684, 691, 800 A.2d 16, 20 (2002), the Court of Special Appeals opined that the purpose of the statutory protections outlined in § 11–106 "can be discerned from an

overview of the entire statutory scheme for imposing discipline on State employees: to prevent an appointing authority from imposing discipline on the basis of an unsubstantiated accusation." *See also W. Corr. Inst. v. Geiger,* 371 Md. 125, 144, 807 A.2d 32, 43 (2002) (stating that "[i]t is significant that one of the prerequisites for the imposition of discipline is the conduct of an investigation of the alleged misconduct"). In *Danaher,* the Court of Special Appeals affirmed this protective aspect of § 11–106 in the context of a management service employee. 148 Md.App. at 166, 811 A.2d at 375. In holding that the investigation undertaken by the employer pursuant to § 11–106 was deficient, the intermediate appellate court stressed that the statute's purpose, in part, was to provide an extra layer of protection, even with respect to at-will employees, to prevent the collateral consequences that may result when an employee is found culpable for "employee misconduct." *See id.* at 176–78, 811 A.2d at 381–82 (noting that, because Danaher, a 25 year veteran of state service, was found responsible for "employee misconduct" and thus terminated "with prejudice," he was subject to possible disqualification from employment with the State for up to three years).

Although we too acknowledge this protective characteristic of § 11–106, we are also mindful that its less than careful application has the potential to alter fundamentally the scope of at-will employment with respect to the management service. Nonetheless, the language of § 11–106 is clear: "Before taking *any* disciplinary action related to employee misconduct, an appointing authority *shall* " follow specific investigatory procedures. (Emphasis added) Based on this plain and unambiguous language, we conclude that, if it appears that a disciplinary action may have been based, even *sub silentio,* on alleged facts constituting "employee misconduct," the "appointing authority" must be held accountable to follow the procedures outlined in § 11–106.

*Id.* at 82–83, 882 A.2d 849 (footnote omitted). *See also Reier v. Dept. of Assessments,* 397 Md. 2, 10, 915 A.2d 970 (2007)

(making reference to "the 30 day period in which the State as an employer has to investigate and effectuate discipline").

One of the steps § 11–106(a) sets forth that must be completed *before* an employee can be disciplined requires the appointing authority to "give the employee a written notice of the disciplinary action to be taken and the employee's appeal rights." SPP § 11–106(a)(5). We note that the tense used in this phrase to describe what the employer is giving notice of— "the disciplinary action *to be* taken"—implies that when the employee receives the notice, the disciplinary action will not yet have been taken.

In this case, the incident occurred on February 1, and February 2006 had 28 days, so discipline had to be imposed no later than March 3, 2006 (because the first day, February 1, is not counted). *See Reier, supra,* 397 Md. at 9, 915 A.2d 970. On March 2, 2006, the notice of termination was prepared and approved by the Secretary of DJS, as required by SPP § 11–104(6). The notice stated that the termination was "effective at the close of the business day on March 3, 2006." Had timely notice pursuant to SPP § 11–106(a)(5) been given to the employee before the close of business on March 3, 2006, the disciplinary action would have met the time limit imposed by SPP § 11–106(b). But SPP § 11–106(a) mandates that all of the steps set forth therein be completed *"[b]efore* taking any disciplinary action." (Emphasis added.)

DJS argues that its mailing of the notice to Miley fully satisfied its obligation to give the employee the specified notice, regardless of whether the employee received that notice before 30 days had elapsed. Such an interpretation could create a situation in which the employee's discipline takes effect before the employee is made aware that the employee has been disciplined. In fact, that is what happened to Miley. Because all of the other steps listed in SPP § 11–106(a) are tasks that must be *completed* prior to the expiration of 30 days, it follows that the employer must complete giving the employee the required written notice within the 30 days as well. Under such circumstances, we conclude that the notice

mailed to Miley on the 30th day did not satisfy the requirement imposed by SPP § 11–106(a)(5).

This interpretation of the statute is supported by the regulations promulgated by the State. *See, e.g., Smack v. Dep't of Health and Mental Hygiene,* 134 Md.App. 412, 420, 759 A.2d 1209 (2000). The pertinent Maryland Regulation is COMAR 17.04.05.04, which provides:

> D. *Before an employee may be disciplined* for conduct-related reasons, *the appointing authority shall:*
>
> > (1) Notify the employee of the misconduct and provide an explanation of the employer's evidence;
> >
> > (2) Investigate the alleged misconduct;
> >
> > (3) Meet with the employee, unless the employee is unavailable or unwilling to meet;
> >
> > (4) Consider any mitigating circumstances;
> >
> > (5) Determine the appropriate disciplinary action, if any, to be imposed; and
> >
> > (6) *Give the employee written notice* of the disciplinary action to be taken and the employee's appeal rights, *and inform the employee of the effective date of the disciplinary action.*
>
> E. Unless otherwise provided by law, an *appointing authority shall take each of the actions required in § D* of this regulation *within the time limits provided in State Personnel and Pensions Article, § 11–106,* Annotated Code of Maryland.

(Emphasis added). If the notice must inform the employee of the date the discipline takes effect "[b]efore an employee may be disciplined," then such duty to give prior notice and inform the employee would not be satisfied by mailing a notice at such a late date that it had no possibility of being received by the employee within the 30 day time period.

We recognize that the relatively short time limit imposed by SPP § 11–106 will sometimes place a burden on the appointing authority that may not be met easily or even with great effort. But, as we noted in *White v. Workers' Compensation*

*Com'n,* 161 Md.App. 483, 489–91, 870 A.2d 1241 (2005) (quoting *Geiger,* 371 Md. at 143–45, 807 A.2d 32), the Court of Appeals's 2002 decision in *Geiger* required strict adherence to the 30 day limit for completing all actions required by SPP § 11–106. We observed in *White* that "[t]he General Assembly is presumed to be aware of the Court of Appeals' interpretation of its enactments," and because the legislature "has not legislatively overturned the interpretation articulated in *Geiger,* we can only conclude that the General Assembly has acquiesced in that interpretation." 161 Md.App. at 491, 870 A.2d 1241. Notwithstanding the passage of additional time, the *Geiger* interpretation of SPP § 11–106 as imposing a strict deadline remains unchanged.

For the forgoing reasons, we agree with the ALJ's decision in this case, which was upheld by the circuit court. We therefore affirm the judgment of the Circuit Court for Baltimore City.

**JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE CITY IS AFFIRMED. COSTS TO BE PAID BY APPELLANT.**