870 A.2d 1241

**Christina WHITE**

v.

**WORKERS' COMPENSATION COMMISSION.**

No. 2645, Sept. Term, 2003.

Court of Special Appeals of Maryland.

April 1, 2005.

Jeffrey M. Ross (Keith J. Zimmerman, on brief), Baltimore, for appellant.

Kimberly Smith Ward (J. Joseph Curran, Jr., Atty. Gen., on brief), for appellee.

Panel MURPHY, C.J., SHARER, ALPERT, PAUL E. (Ret., specially assigned), JJ.

ALPERT, J.

Christina White, appellant, is an employee of appellee, the Maryland Workers' Compensation Commission ("WCC"). On February 6, 2003, White was suspended without pay for five days. She appealed the suspension on the ground that the appointing authority, WCC Chairman Thomas O'Reilly, did not impose the suspension within five (5) work days following the close of her last shift after acquiring knowledge of the misconduct for which she was suspended, as required by Md.Code Ann., State Pers. & Pens. ("SPP") § 11–106(c)(1). On June 20, 2003, Administrative Law Judge Eleanor Wilkin-

son ("ALJ") rescinded White's suspension, finding that her suspension was untimely.

WCC filed a petition for judicial review seeking reversal of the ALJ's decision to rescind White's suspension. The Circuit Court for Baltimore City reversed the decision of the ALJ and this appeal followed.

The sole issue presented for our consideration is whether the ALJ's decision to rescind White's suspension was supported by substantial evidence and free of legal error. Finding that it was, we shall reverse the decision of the circuit court.

### *Factual Background*

The basic facts of this case are not in dispute. At all times relevant to this appeal, White was employed as an Assistant Commissioner II with the WCC. On November 19, 2002, she testified at a hearing at the Office of Administrative Hearings ("OAH") regarding the duties of some of her co-workers. Subsequently, on January 14, 2003, at a staff meeting called by an administrator, Judith Johnston, White made some comments that led Johnston to question whether White had given truthful testimony at the November 19th meeting at the OAH. On January 14, 2003, Johnston informed Chairman O'Reilly, both verbally and in a written memorandum, that White's statements at the meeting were contrary to her sworn testimony at the OAH.

In response to the information received from Johnston, O'Reilly "immediately ordered the transcript" of the OAH hearing. He received that transcript on January 31, 2003. After reviewing the transcript, O'Reilly concluded that White had not told the truth when she testified before the OAH.

O'Reilly met with White on February 4, 2003, to discuss the matter of her testimony at OAH and her statements at the meeting of January 14th. Two days later, O'Reilly informed White that she was to be suspended without pay for five days, from February 7–13, 2003. In a Notice of Disciplinary Action

dated February 6, 2003, White was advised that she had violated the following provisions of COMAR:

17.04.05.04(B)(3)(being guilty of conduct that has brought, or if publicized, would bring the State into disrepute); 17.04.05.04(B)(8)(engaging in conduct involving dishonesty, fraud, deceit, misrepresentations, or illegality); and, 17.04.05.04(B)(10)(willfully making a false official statement or report).

The Notice of Disciplinary Action also advised White that the date of the incident prompting her suspension was January 14, 2003.

On appeal, the ALJ found that O'Reilly acquired knowledge of White's misconduct on January 14, 2003, and that the close of White's next shift was on January 15, 2003. The ALJ concluded that in order for White's suspension to be timely imposed pursuant to SPP § 11–106(c)(1), it would have had to have been imposed by the close of business on January 23, 2003. Since the suspension was not imposed until February 6th, the ALJ concluded that White's suspension was not imposed in a timely manner and must be rescinded.

Appellee filed a petition for judicial review with the Circuit Court for Baltimore City, which reversed the ALJ's decision. This timely appeal followed.

### Standard of Review

In reviewing a contested case decision made by an administrative agency, our role " 'is limited to determining if there is substantial evidence in the record as a whole to support the agency's findings and conclusions, and to determine if the administrative decision is premised on an erroneous conclusion of law.' " *Adventist Healthcare Midatlantic, Inc. v. Suburban Hosp., Inc.,* 350 Md. 104, 120, 711 A.2d 158 (1998)(quoting *United Parcel v. People's Counsel,* 336 Md. 569, 577, 650 A.2d 226 (1994)). In *Adventist Healthcare Midatlantic, Inc.,* the Court noted:

"This standard of review is both narrow and expansive. It is narrow to the extent that reviewing courts, out of defer-

ence to agency expertise, are required to affirm an agency's findings of fact, as well as its application of law to those facts, if reasonably supported by the administrative record, viewed as a whole. The standard is equally broad to the extent that reviewing courts are under no constraint to affirm an agency decision premised solely upon an erroneous conclusion of law."

*Id.* (quoting *Insurance Com'r for the State v. Engelman,* 345 Md. 402, 411, 692 A.2d 474 (1997) (citations omitted)).

When we review an administrative decision, "we perform precisely the same role as the circuit court." *Ocean City Police Department v. Marshall,* 158 Md.App. 115, 121, 854 A.2d 299 (2004)(and cases cited therein). We look only at the decision of the agency, and not that of the circuit court. *Id.* Ordinarily, we are constrained to affirm the agency decision only for the reasons given by the agency, but where a pure question of law is involved, we may substitute our judgment for that of the administrative agency. *Id.*

The case *sub judice* presents an issue of statutory construction. In *Smack v. Dep't. of Health and Mental Hygiene,* 378 Md. 298, 835 A.2d 1175 (2003), the Court of Appeals reviewed the well settled and oft repeated canons of statutory construction:

The predominant goal of statutory construction "is to ascertain and implement, to the extent possible, the legislative intent." We begin the interpretive analysis with the words of the statute and, when they are clear and unambiguous, there is no need to search further. "[W]e look first to the words of the statute, on the tacit theory that the Legislature is presumed to have meant what it said and said what it meant." In that regard, the statute must be given a reasonable interpretation, "not one that is illogical or incompatible with common sense." Moreover, statutes are to be interpreted so that no portion is rendered superfluous or nugatory. Words may not be added to, or removed from, an unambiguous statute in order to give it a meaning not reflected by the words the Legislature chose to use, "[n]or

[may we] engage in forced or subtle interpretation in an attempt to extend or limit the statute's meaning."

When the statute is ambiguous—the words do not clearly disclose the legislative intention or, while clear and unambiguous viewed in isolation, the terms are ambiguous when it is part of a larger statutory scheme, we look for legislative intent in other indicia, including the history of the legislation or other sources extraneous to the statute itself, as well "as the structure of the statute, how it relates to other laws . . . its general purpose, and the 'relative rationality and legal effect of various competing constructions.' " We pointed out in *Witte [v. Azarian,* 369 Md. 518, 525, 801 A.2d 160 (2002)] that "[o]ne aspect of examining these indicia is the presumption, which itself is a rule of construction, that the Legislature 'intends its enactments to operate together as a consistent and harmonious body of law,' such that no part of the statute is rendered meaningless and nugatory."

In that regard, where the statute to be construed is a part of an entire statutory scheme, construction of the provisions of the scheme must be done in the context of that scheme. When, in that context, two statutes conflict and one is general and the other specific, "the statutes may be harmonized by viewing the more specific statute as an exception to the more general one."

*Smack,* 378 Md. at 304–06, 835 A.2d 1175 (citations omitted).

With these standards in mind, we shall examine the issue presented.

### *Discussion*

Maryland law permits an appointing authority to take a number of disciplinary actions against an employee, including suspension without pay. SPP § 11–104(3). The duty of an appointing authority prior to imposing such a sanction is set forth in SPP § 11–106, which provides:

(a) *Procedure.*—Before taking any disciplinary action related to employee misconduct, an appointing authority shall:

(1) investigate the alleged misconduct;

(2) meet with the employee;

(3) consider any mitigating circumstances;

(4) determine the appropriate disciplinary action, if any, to be imposed; and

(5) give the employee a written notice of the disciplinary action to be taken and the employee's appeal rights.

(b) *Time limit.*—Except as provided in subsection (c) of this section, an appointing authority may impose any disciplinary action no later than 30 days after the appointing authority acquires knowledge of the misconduct for which the disciplinary action is imposed.

(c) *Suspension.*—(1) An appointing authority may suspend an employee without pay no later than 5 workdays following the close of the employee's next shift after the appointing authority acquires knowledge of the misconduct for which the suspension is imposed.

(2) Saturdays, Sundays, legal holidays, and employee leave days are excluded in calculating the 5–workday period under this subsection.

Both subsections (b) and (c) contain similar language permitting disciplinary action or suspension when "the appointing authority acquires knowledge of the misconduct for which the" disciplinary action or suspension is imposed.

This phrase was considered by the Court of Appeals in *Western Correctional Institution v. Geiger*, 371 Md. 125, 807 A.2d 32 (2002). In that case, the high court recognized that, when viewed in context, the phrase "is not ambiguous and, in fact, clearly pinpoints when the time limit for imposing disciplinary action starts." *Id.* The Court reasoned:

All three subsections of § 11–106 are interrelated; one can not be read and interpreted without reading and interpreting the others. Subsection (a) prescribes what must be done before imposing discipline, subsection (b) sets the general time limitation on when the imposition of discipline must occur and subsection (c) provides a special time limit for suspensions without pay.

It is significant that one of the prerequisites for the imposition of discipline is the conduct of an investigation of the alleged misconduct. To be sure, as the Court of Special Appeals observed, "[t]here is an important distinction between (1) information that indicates the necessity for an investigation, and (2) the completion of an investigation required by § 11–106(a)(1)." *Geiger*, 130 Md.App. at 569, 747 A.2d at 701. The intermediate appellate court, thus, drew a distinction between the quantum of knowledge the appointing authority must have at the beginning of the process and at the end, when the investigation is complete, settling on a level of knowledge sufficient to justify the imposition of discipline. Section 11–106(b) does not, by its terms, state a distinction between the amount of knowledge necessary to initiate an investigation and that required to discipline. It simply prohibits the imposition of discipline more than thirty days after knowledge of the misconduct for which the disciplinary action is imposed is acquired. Knowledge sufficient to order an investigation is knowledge of the misconduct for which discipline was imposed, if discipline ultimately is imposed for that misconduct. It is not at that stage in the process, to be sure, proof as to who is the responsible person and may not even be knowledge as to who that person is. Section 11–106, however, is not person specific; it is situation and fact based. Thus, the knowledge that triggers the running of the thirty day period need not, and may not, although it generally will, identify the employee ultimately disciplined.

We hold that, viewed in context, § 11–106 gives the appointing authority 30 days to conduct an investigation, meet with the employee the investigation identifies as culpable, consider any mitigating circumstances, determine the appropriate action and give notice to the employee of the disciplinary action taken.

*Geiger*, 371 Md. at 143–45, 807 A.2d 32.

In reaching this holding, the Court of Appeals examined the legislative history of Section 11–106. The Court considered, among other things, Executive Order No. 01.01.1995.15, dated

June 9, 1995, by which Governor Glendening established a Task Force to Reform the State Personnel Management System; the Task Force's Final Report of June 19, 1996; and documents in the legislative file submitted as the legislation progressed through the General Assembly. From these materials, the Court concluded that the legislature intended to establish a specific time period in which an appointing authority must investigate, meet with the employee, and impose discipline. Based on the language of the statute and the legislative history, the Court in *Geiger* determined that the legislature intended to establish a bright line rule designed to afford certainty and uniformity in the application of disciplinary policies throughout the various State agencies.

Section 11–106(c)(1) requires an appointing authority to give an employee notice of suspension within 5 work days after the close of the employee's next shift after acquiring knowledge of employee misconduct sufficient to order an investigation. The reasoning articulated in *Geiger* requires us to hold, *sub judice*, that any suspension imposed outside of the 5 work day time limit is violative of the statute and cannot stand.

In reaching this conclusion, we recognize that since the Court of Appeals' decision in *Geiger*, the General Assembly has not amended the statute to modify the Court of Appeals' interpretation of the time limits established in Section 11–106. The General Assembly is presumed to be aware of the Court of Appeals' interpretation of its enactments. *Forbes v. State,* 324 Md. 335, 342–43, 597 A.2d 427 (1991); *Williams v. State,* 292 Md. 201, 210, 438 A.2d 1301 (1981). *Geiger,* 371 Md. at 144, 807 A.2d 32. Since it has not legislatively overturned the interpretation articulated in *Geiger*,[1] we can only conclude that the General Assembly has acquiesced in that interpretation. *Id.*

---

1. No bills have been introduced in the General Assembly since the *Geiger* decision in 2002 seeking to amend Section 11–106(b) or (c).

In the case at hand, the ALJ found that the appointing authority, Chairman O'Reilly, was informed of White's alleged misconduct on January 14, 2003, that White's next shift ended on January 15, 2003, and that 5 work days from January 15th was January 23, 2003. These findings were supported by substantial evidence, including the testimony of both Chairman O'Reilly and White and White's time sheet for the month of January 2003. Because White was not given notice of her suspension until February 6, 2003, her suspension was untimely and must be rescinded.

JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE CITY REVERSED; CASE REMANDED TO THAT COURT FOR THE PURPOSE OF ENTERING AN ORDER AFFIRMING THE DECISION AND ORDER OF THE OFFICE OF ADMINISTRATIVE HEARINGS DATED JUNE 20, 2003; COSTS TO BE PAID BY APPELLEE.