9 A.3d 534

**Charles Y. KIM**

v.

**MARYLAND STATE BOARD OF PHYSICIANS.**

**No. 1749, Sept. Term, 2009.**

Court of Special Appeals of Maryland.

Dec. 3, 2010.

364

Frederick W. Goundry, III (Conrad W. Varner, Shelley L. Bagoly, Varner & Goundry, on the brief) Frederick, MD, for appellant.

Francesca Gibbs (Dept. of Health and Mental Hygiene, on the brief) Baltimore, MD, for appellee.

Panel: EYLER, JAMES R., HOTTEN, CHARLES E. MOYLAN, JR., (Retired, specially assigned), JJ.

EYLER, JAMES R., J.

The Maryland State Board of Physicians ("appellee" or the "Board") charged Charles Y. Kim ("appellant") with willfully making three false statements about his involvement in a medical malpractice action on his 2006 medical licensure renewal application. Appellant received a hearing before an Administrative Law Judge in the Office of Administrative hearings ("ALJ"), who determined that appellant had made the false statements intentionally and willfully, and further found that he had thereby engaged in unprofessional conduct in the practice of medicine. Appellant filed exceptions with the Board. After a hearing, the Board adopted the ALJ's findings. The Board reprimanded appellant, fined him $5,000, required him to take an ethics course, and placed him on probation. Appellant petitioned for judicial review in the Circuit Court for Frederick County, which affirmed. This appeal followed. We, too, affirm.

## Facts and Proceedings

Appellant has been licensed and has practiced medicine in Maryland since 1977. He was born, reared, and educated in Korea. His native language is Korean. To receive his medical license in Maryland, appellant completed a three-year residency program conducted in English and passed a written and oral English proficiency test.

In 2005, appellant was a defendant in a medical malpractice suit pending in the Circuit Court for Frederick County, captioned *Wagner v. Kim,* Civil No. C–05–1251. The plaintiff in that case had filed a complaint against appellant on April 19, 2005. Appellant, through counsel, answered the complaint a month later. In November 2005, appellant was deposed.

In February 2006, appellant filed an application for reappointment to the medical staff at Frederick Memorial Hospital ("FMH application"). In the FMH application, appellant admitted that the *Wagner* case and two others had been filed

against him. He also noted that the *Wagner* case would go to trial in November 2006.

Nonetheless, when appellant later completed his license renewal application on August 15, 2006, he answered "no" to the following questions:

SINCE JULY 1, 2004:

. . .

6(m) Have you been named as a defendant in a filing or a settlement of a medical malpractice action?

. . .

13(b) Have you, your parents or associates or anyone in your immediate family or household, been sued or had a claim filed against you or any of them for medical malpractice?

. . .

13(f) Are you, or any member of your immediate family or household currently a party in a medical malpractice case?

. . . .

In November 2006, the Board learned that, contrary to the statements made in his license renewal application, appellant was involved in the *Wagner* case. The Board learned this during the course of a separate standard of care proceeding initiated by the Board against appellant, Case No. 2004–0803.[1] In that proceeding, a "Case Resolution Conference" ("CRC") to explore resolution of the issues prior to an evidentiary hearing was scheduled for December 6, 2006. Prior to December 6, in a telephone conversation, appellant's attorney advised the administrative prosecutor that appellant would not be able to attend the CRC on that date because he had a court appointment in Frederick County. The administrative prosecutor mentioned the conversation to a Board investigator, who then reviewed appellant's file and performed a "Judiciary Case Search" on the internet. The search unearthed the *Wagner* case.

---

1. The Board eventually dismissed that case.

Based on this finding, the Board charged appellant with violating the following subsections of the Maryland Medical Practice Act, Title 14 of the Health Occupations Article of the Maryland Code: (1) Maryland Code, Health Occ. § 14–404(a)(3), prohibiting unprofessional conduct in the practice of medicine; (2) *Id.* § 14–404(a)(11), prohibiting the willful filing of a false statement in the practice of medicine; and (3) *Id.* § 14–404(a)(36), prohibiting the willful making of a false representation when making an application for licensure or any other application related to the practice of medicine. The Board sought that appellant be reprimanded, that he take a course on ethics, and that he be required to pay a $10,000 fine.

Appellant requested and received a hearing before an ALJ. The ALJ issued a Proposed Decision upholding the Board's charges and recommending that appellant be reprimanded and required to take an ethics course. The ALJ also recommended that a fine be imposed but reduced to $5,000. As to the fine, the ALJ noted that a fine in addition to a reprimand had to be not less than $5,000 and not more than $30,000. COMAR 10.32.02.06C(4)(d). The ALJ reasoned that, under COMAR 10.32.02.06C(3), the amount should be determined based on (1) the extent to which appellant derived any financial benefit from the misconduct, (2) the willfulness of the sanctioned conduct, and (3) the extent of actual or potential public harm caused by the misconduct. With these factors in mind, the ALJ concluded that a fine of $10,000 would be "extreme and egregious," but that a $5,000 fine would properly reflect the nature and extent of appellant's misconduct.

Appellant filed exceptions with the Board, which adopted the ALJ's finding that appellant violated each of the three relevant sections of the Medical Practice Act. The Board also adopted the ALJ's proposal that appellant be reprimanded, fined $5,000 (rather than $10,000), and required to take an ethics course. In addition, the Board placed appellant on probation "in order for the Board to supervise compliance with the requirement of the ethics course and in order to deter [appellant] and other physicians from this type of conduct in the future." Following the Board's final decision and order,

appellant petitioned for judicial review in the circuit court. The circuit court affirmed. This appeal followed.

## Standard of Review

In reviewing administrative decisions, we bypass the judgment of the circuit court and look directly at the administrative decision. *White v. Workers' Comp. Comm'n,* 161 Md. App. 483, 487, 870 A.2d 1241 (2005); *see, e.g., Gigeous v. E. Corr. Inst.,* 363 Md. 481, 495–96, 769 A.2d 912 (2001) (On appeal, "we reevaluate the decision of the agency, not the decision of the lower court."). "Ordinarily, we are constrained to affirm the agency decision only for the reasons given by the agency...." *White,* 161 Md.App. at 487, 870 A.2d 1241.

The scope of judicial review of administrative fact-finding is a particularly narrow and highly deferential one. *People's Counsel for Balt. County v. Loyola College in Md.,* 406 Md. 54, 66, 956 A.2d 166 (2008). Accordingly, we will affirm a decision on the facts if it is supported by "substantial evidence." *See id.* at 67, 956 A.2d 166. An agency's fact-finding is based on substantial evidence if "supported by such evidence as a reasonable mind might accept as adequate to support a conclusion." *People's Counsel for Balt. County v. Surina,* 400 Md. 662, 681, 929 A.2d 899 (2007) (quoting *Mayor of Annapolis v. Annapolis Waterfront Co.,* 284 Md. 383, 398, 396 A.2d 1080 (1979)).

Administrative credibility findings are likewise entitled to great deference on judicial review. Credibility findings of hearing officers who themselves have personally observed the witnesses "have almost conclusive force...." *Anderson v. Dep't of Public Safety,* 330 Md. 187, 217, 623 A.2d 198 (1993) (citations omitted).

When "a pure question of law is involved, we may substitute our judgment for that of the administrative agency." *White,* 161 Md.App. at 487, 870 A.2d 1241. However, "[a]n administrative agency's interpretation and application of the statute it administers should ordinarily be given considera-

ble weight by the reviewing courts." *Bd. of Physician Quality Assurance v. Banks*, 354 Md. 59, 69, 729 A.2d 376 (1999).

 Last, an agency's choice of sanction is entitled to even greater deference than factual findings or legal conclusions. *Spencer v. Bd. of Pharmacy*, 380 Md. 515, 529–31, 846 A.2d 341 (2004).

> As long as an administrative sanction or decision does not exceed the agency's authority, is not unlawful, and is supported by competent, material and substantial evidence, there can be no judicial reversal or modification of the decision based on disproportionality or abuse of discretion unless, under the facts of a particular case, the disproportionality or abuse of discretion was so extreme and egregious that the reviewing court can properly deem the decision to be 'arbitrary or capricious.'

*MTA v. King*, 369 Md. 274, 291, 799 A.2d 1246 (2002). The agency's determination of a sanction must not be second-guessed upon judicial review, even if the court might have imposed a different sanction. *Id.* at 291, 799 A.2d 1246.

## Discussion

Appellant essentially makes four arguments [2] on appeal: (1) the ALJ failed to address the evidence that the Board impermissibly used appellant's attorney's CRC scheduling statement to charge appellant with the violations at issue in this case; (2) the ALJ incorrectly found that appellant's conduct was "within the practice of medicine," as required under § 14–404(a)(3) and § 14–404(a)(11); (3) there is insufficient evidence to show that appellant's conduct was willful, in violation of § 14–404(a)(11) and (36); and (4) the sanction imposed on appellant was excessive. We reject each contention.

---

**2.** Appellant frames these arguments as five issues. For purposes of clarity and ease of analysis, we have combined appellant's issues (3) and (4) into a single argument.

### 1. The Board's Use of Appellant's Attorney's Scheduling Statement

 Appellant first argues that the Board wrongfully used the statement that appellant would be in court for a separate proceeding to charge him with the violations in this case. Appellant stresses that the statement was made in the context of a CRC, which is a "voluntary, informal, and confidential proceeding to explore the possibility of a consent order or other resolution" of Board charges. COMAR 10.32.02.03.C(7). The Board's use of that statement, he argues, violated the regulation governing CRC confidentiality, which prohibits the Board from making "later use of any commentary, admissions, facts revealed, or positions taken, unless the subject matter is available from other sources or is otherwise discovered." COMAR 10.32.02.03.C(7)(d). In appellant's view, the ALJ erroneously failed to address the Board's impermissible use of the statement. This argument fails for the following reasons.

 First, and most importantly, the statement that appellant would be in court on the date scheduled for the CRC was not substantive in nature—it merely concerned the logistics of the CRC. As the Board noted in considering appellant's exceptions, COMAR 10.32.02.03.C(7) does not even apply in this instance because "[t]he statement of [appellant's] counsel (1) was not part of the CRC process but was a comment made during a scheduling telephone call between the two attorneys; [and] (2) was not related to anything at issue in the scheduled CRC...." In other words, issues concerning the mere logistics of a CRC are not entitled to confidentiality or any special treatment under the regulation. We agree with the Board's determination on this point. Reviewing courts should give special deference to an agency's interpretation of its own regulations because the agency is best able to discern its intent in promulgating those regulations. *Changing Point, Inc. v. Maryland Health Resources Planning Comm'n*, 87 Md.App. 150, 160, 589 A.2d 502 (1991).

Moreover, the regulation governing CRC confidentiality prohibits the Board from later using "commentary, admis-

sions, facts revealed, or positions taken, *unless the subject matter is available from other sources or is otherwise discovered.*" COMAR 10.32.02.03.C(7)(d) (emphasis added). The subject matter of the statement made in this instance (the fact that appellant was in court on a certain day) was available from another source-existence of the *Wagner* case was readily ascertainable on the Case Judiciary website. The only "use" the Board made of the statement was to initiate an investigation that engendered evidence, derived completely from an independent source, that appellant made false statements on his licensure application.

### 2. *Interpretation of "In the Practice of Medicine"*

 Appellant's next contention is that the Board wrongly construed the phrase "in the practice of medicine" as that term is used in § 14–404(a)(3) and § 14–404(a)(11). "Practice of medicine" is defined in § 14–101(n):

(n) *Practice medicine.—*

(1) "Practice medicine" means to engage, with or without compensation, in medical:

(i) Diagnosis;

(ii) Healing;

(iii) Treatment; or

(iv) Surgery.

(2) "Practice medicine" includes doing, undertaking, professing to do, and attempting any of the following:

(i) Diagnosing, healing, treating, preventing, prescribing for, or removing any physical, mental, or emotional ailment or supposed ailment of an individual[.]

. . . .

In appellant's view, neither the plain language of the statute, nor the case law construing it, extend to the filing of a license renewal application. The ALJ rejected this argument, observing that appellate courts have expanded the meaning of "in the practice of medicine" sufficiently to include disclosure

of malpractice suits on license renewal applications. The Board agreed with the ALJ's interpretation. We also agree.

The subject of what is included in the "practice of medicine" has been visited several times by both this Court and the Court of Appeals. In 1984, the Court of Appeals decided *McDonnell v. Commission on Medical Discipline*, 301 Md. 426, 483 A.2d 76 (1984). In that case, the Court of Appeals considered whether a physician who attempted to intimidate witnesses scheduled to testify against him in a medical malpractice action could be disciplined for "immoral conduct of a physician in his practice as a physician," under the predecessor [3] to § 14–404(a)(3). *McDonnell*, 301 Md. at 428, 483 A.2d 76. The Court concluded that Dr. McDonnell's conduct, although "improper and not to be condoned," did not occur "in his practice as a physician," *id.* at 434, 483 A.2d 76, reasoning that the meaning of the phrase "practice as a physician" was limited "to matters pertaining essentially to the diagnosis, care or treatment of patients." *Id.* at 436, 483 A.2d 76. Specifically, the Court held:

> [I]t is not any immoral conduct of a physician committed during the time of his licensure which is within the terms of [§ 14–404(a)(3) ]. Nor would that subsection embrace immoral conduct simply because, in some manner, it had a general or associative relationship to the physician in his capacity as a member of the medical profession. On the contrary ... the application of [§ 14–404(a)(3) ] is directly tied to the physician's conduct in the actual practice of medicine, i.e., in the diagnosis, care, or treatment of patients.

*McDonnell*, 301 Md. at 436–37, 483 A.2d 76.

Several years later, in *Board of Physician Quality Assurance v. Banks*, 354 Md. 59, 729 A.2d 376 (1999), the Court of Appeals re-examined the phrase "in the practice of medicine," and distinguished *McDonnell*. In *Banks*, Dr. Banks engaged

---

**3.** Section 14–404(a)(3) was formerly codified at Md.Code Ann. (1957, 1980 Repl. vol.), Art. 43, § 130(h)(8).

in sexually harassing conduct towards co-employees while he was on duty at a hospital. Dr. Banks argued that, per the holding in *McDonnell*, his behavior was not within the practice of medicine because, when it occurred, he was not "in the immediate process" of diagnosing, treating, or evaluating patients. *Banks*, 354 Md. at 71–73, 729 A.2d 376. The Court, however, noting that the "Board has a high degree of expertise in determining what constitutes unprofessional conduct 'in the practice of medicine,' " *id.* at 76, 729 A.2d 376, rejected Dr. Banks's argument, and refused to more narrowly construe § 14–404(a)(3), as doing so "would lead to unreasonable results and render the statute inadequate to deal with many situations which may arise." *Banks*, 354 Md. at 73, 729 A.2d 376. The Court also noted that other jurisdictions "have not applied an extremely technical and narrow definition of the practice of medicine." *Id.* at 74, 729 A.2d 376 (citing cases).

Subsequently, in *Finucan v. Maryland Board of Physician Quality Assurance*, 380 Md. 577, 846 A.2d 377 (2004), the Court of Appeals reviewed the Board's charge that Dr. Finucan violated § 14–404(a)(3) by engaging in a series of sexual relationships with several female patients, while maintaining, at the same time, a physician-patient relationship with them. *Id.* at 580, 846 A.2d 377. Dr. Finucan argued that his having sex with his patients was not "in the practice of medicine." *Id.* at 595, 846 A.2d 377. The Court, again favoring a broader definition of the practice of medicine, *id.* at 599, 846 A.2d 377, rejected Dr. Finucan's argument, opining that

[u]nethical conduct may indicate unfitness to practice medicine if it raises reasonable concerns that an individual abused, or may abuse, the status of being a physician in such a way as to harm patients or diminish the standing of the medical profession in the eyes of a reasonable member of the general public.

*Id.* at 601, 846 A.2d 377.

Most recently, and most notably, in *Cornfeld v. State Board of Physicians*, 174 Md.App. 456, 921 A.2d 893 (2007), we reviewed the Board's charge that Dr. Cornfeld made false

statements to hospital peer reviewers and Board investigators, thereby engaging in "professional misconduct in the practice of medicine" in violation of § 14–404(a)(3).[4] *Id.* at 468, 921 A.2d 893. Dr. Cornfeld made these statements to the peer reviewers and the Board to influence decisions concerning his fitness to practice medicine in the hospital and in Maryland generally. *Id.* at 479, 921 A.2d 893. The ALJ in *Cornfeld* concluded that Dr. Cornfeld's misrepresentations did not fall within the practice of medicine, but the Board disagreed and, citing its own precedents, reasoned that "making a false application or submitting false testimony for a Board proceeding are 'clearly within the practice of medicine.' " *Id.* at 468, 921 A.2d 893.

This Court agreed with the Board that Dr. Cornfeld's dishonesty occurred "in the practice of medicine." *Id.* at 479, 921 A.2d 893. First, citing *Finucan, Banks,* and *McDonnell,* we summarized the case law defining the phrase "in the practice of medicine," stating:

> Misconduct reasonably may be considered to be in the practice of medicine when it "relates to the effective delivery of patient care." Such a relationship may be established by evidence that the physician abused his status as a physician in a manner that either harmed patients, created a substantial risk of harm to them, or diminished the standing of the medical profession as caregivers. The presence of one or more of these effects sufficiently ties the physician's misconduct to the exercise of medical judgment and duties to warrant a finding that it occurred "in the practice of medicine."

*Id.* at 477–78, 921 A.2d 893 (quotations omitted).

With those principles in mind, we concluded that "unreasonable results" would occur if we were to "exclude dishonesty in

---

4. Although the Board only disciplined Dr. Cornfeld for "professional misconduct" under § 14–404(a)(3), and not for "making a false report or record" under § 14–404(a)(11), the Board "evidently treat[ed] his 'making [of] a false report or record' as a species of 'professional misconduct.' " *Cornfeld,* 174 Md.App. at 471, n. 3, 921 A.2d 893.

hospital peer review proceedings as sanctionable misconduct," and "[a] similar discordant result would follow if we were to hold that Cornfeld's false statement to the Board did not fall within the scope of practicing medicine." *Id.* at 482, 921 A.2d 893. First, we noted that misrepresentations to a hospital peer review committee are related, if indirectly, to the "effective delivery of patient care" because "such dishonesty diminishes the standing of the medical profession as caregivers." *Id.* at 481, 921 A.2d 893. Turning to Dr. Cornfeld's reiteration of those misrepresentations to the Board, we stressed that the "Board's mission [is] to regulate the use of physician's licenses in Maryland," *id.* at 481, 921 A.2d 893 [citation omitted], in order to "protect and preserve the public health." Second, we noted that "[t]he Board's conclusion that Dr. Cornfeld's false statements to the hospital and the Board constituted 'professional misconduct in the practice of medicine' has 'considerable weight' in this Court, because the Board's expertise in interpreting and applying HO section 14–404(a) is entitled to judicial respect." *Id.* at 479, 921 A.2d 893 (citations omitted).

In this case, appellant argues—just as Dr. Cornfeld did—that his false statements to the Board did not logically occur "in the practice of medicine." We reject this argument for substantially the same reasons we rejected Dr. Cornfeld's argument. First, appellant's misconduct was sufficiently intertwined with the "effective delivery of patient care." As the ALJ in this case noted, a physician's failure to disclose the existence of a medical malpractice lawsuit on his license renewal application constitutes serious misconduct that (1) may involve substantial risk of harm to patients, and (2) may diminish the standing of the medical profession as caregivers. The failure to disclose such information, the ALJ explained, "interferes with the Board's obligation to investigate the proper delivery of patient care, and its obligation to protect the public health and adequately regulate the medical profession." Second, we recognize and pay deference to the Board's interpretation of § 14–101—a statute it administers—as including statements made in applications to the Board. Indeed, this is not the first time the Board has set forth that interpretation.

Even though *Cornfeld* concerned false *testimony* to the Board, not false *statements* on a Board application, the Board in *Cornfeld* cited its own precedents to support its position that *"making a false application,"* in addition to "submitting false testimony for a Board proceeding" would " 'clearly [fall] within the practice of medicine.' " *Id.* at 468, 921 A.2d 893.

Beyond those reasons, we acknowledge and apply this Court and the Court of Appeals' consistent pattern of rejecting narrow interpretations of the phrase "in the practice of medicine." Ultimately, we agree with the administrative finding that appellant's failure to disclose the *Wagner* case in his license renewal application occurred "in the practice of medicine," as that term is used in § 14–404(a)(3) and § 14–404(a)(11).

### 3. Substantial Evidence of Appellant's § 14–404(a)(11) and (36) Violations

 Third, appellant contends that the Board failed to prove that his false statements were made *willfully.* Appellant premises this assertion on his interpretation of the term "willful." He cites *Board of Physicians v. Elliott,* 170 Md. App. 369, 907 A.2d 321 (2006), to argue that a "willful" violation requires not only that appellant *knew* his answers were false, but also that appellant *intended to deceive* the Board. In appellant's view, the State failed to produce evidence of intentional deceit. In fact, appellant argues, he testified that he did not harbor intent to deceive. He argues further that he lacked motive to conceal the *Wagner* suit because he had no reason to believe he would be denied a license by such a disclosure. Further, appellant emphasizes his strong reputation for honesty. A fellow doctor testified that appellant's reputation is " [i]mpeccable" and that he has "never heard a negative thing said about [appellant] other than his imperfections in the English language." Last, appellant claims that the false statements resulted from his confusion with the English language, and an inability to read English well does not amount to deceit.

██ We disagree with appellant's interpretation of "willful," as that term is used in § 14–404(a)(36). To prove that appellant's false statements were made willfully, the Board did not have to show specific intent to deceive. In *Deibler v. State*, 365 Md. 185, 776 A.2d 657 (2001), the Court of Appeals acknowledged that courts have adopted varying interpretations of the term "willful," but deemed the following interpretation the most consistent with prior decisions:

> The third interpretation requires only that the act be committed voluntarily and intentionally, as opposed to one that is committed through inadvertence, accident, or ordinary negligence.

*Id.* at 195, 776 A.2d 657 (quotations and citations omitted). We recognize that *Deibler* involved the interpretation of the word "willful" under a criminal statute. It is nevertheless instructive because, as the *Deibler* Court noted, the term "willfulness" has generally been found to have the same meaning in criminal and civil statutes. *Id.* at 196, 776 A.2d 657. Furthermore, in reviewing Maryland administrative disciplinary proceedings, courts have used a definition consistent with the *Deibler* Court's interpretation: to amount to "willfulness," an act must be carried out intentionally, voluntarily, and not accidentally. *Attorney Grievance Comm'n v. Tayback*, 378 Md. 578, 837 A.2d 158 (2003). A willful act does not require a deceitful or fraudulent motive. *Id.*; *see also Attorney Grievance Comm'n v. Gavin*, 350 Md. 176, 191, 711 A.2d 193 (1998); *Attorney Grievance Comm'n v. Boyd*, 333 Md. 298, 309, 635 A.2d 382 (1994).

Appellant's reliance on the *Elliott* case is misplaced. That case was not decided under § 14–404(a)(36). Rather, the Board in *Elliott* found that the physician had violated § 14–404(a)(1), which requires a showing that a physician "fraudulently or deceptively obtain[ed] or attempt[ed] to obtain a license." In fact, the Board in *Elliott* expressly declined to decide whether the physician in that case had violated § 14–404(a)(36), because, once it found a § 14–404(a)(1) violation, it concluded that finding violations of additional subsections

would not change the severity of sanctions. *Id.* at 403–04, 907 A.2d 321.

The correct standard is whether appellant intentionally, non-accidentally, and non-inadvertently, made false statements on his application. Substantial evidence indicates that he did.

First, we agree with the ALJ that "[t]he overwhelming evidence demonstrates that [appellant] had actual knowledge of the [*Wagner*] malpractice case filed against him" when he filled out his application on August 15, 2006. The *Wagner* claim was filed against appellant on April 19, 2005. The complaint was sent to his address of record. Soon afterwards, appellant discussed the case with his attorney. On June 6, 2005, the case was filed in the circuit court. Appellant filed an answer on July 6, 2005, and was deposed in November 2005. Further, appellant revealed his knowledge of and involvement in the *Wagner* case when, on February 23, 2006, he filed his FMH application. On that application, appellant acknowledged that the *Wagner* claim and two others had been made against him in the past two years. Last, and most importantly, appellant testified that, at the time he filled out the license renewal application, he knew that the "*Wagner* case [was] on the way on the court next couple months."

Second, we reject appellant's claim that the false statements were accidental and inadvertent. The ALJ deemed this claim "unbelievable and unpersuasive." We note at the outset that administrative credibility findings carry "almost conclusive force" and are entitled to great deference on judicial review. *Anderson v. Dep't of Public Safety,* 330 Md. 187, 217, 623 A.2d 198 (1993).

Specifically, appellant testified that he misread Question 6.m. because he believed that the question was asking whether he had been named as a defendant in a filing *and* settlement of a medical malpractice action, rather than in a filing *or* settlement of a malpractice action. However, Question 6.m. clearly asks whether the applicant has been named as a defendant in the filing *or* settlement, and appellant testified that he understood the difference between "or" and "and."

Appellant's reason for misunderstanding Question 13.b. is similar to his reason for misunderstanding Question 6.m.[5] That question asks whether "you, your partners or associates or anyone in your immediate family or household, [have] been sued or had a claim filed against you or any of them for medical malpractice." Appellant claimed that he thought this question was only asking whether a malpractice case was pending against members of his family—not him. As the ALJ noted, however, the question prominently displays the word "you" before it lists others, and again, appellant acknowledged that he understands the meaning of the word "or."

Appellant argues more broadly that the false statements resulted, in large part, due to his difficulty understanding the English language. The ALJ found this excuse "unconvincing and not credible." We defer to that finding. The fact that English is appellant's second language does not satisfactorily justify his false answers. The record shows that appellant has been licensed to practice medicine in Maryland since 1977 and has, in fact, practiced medicine in Maryland for thirty years. He is an intelligent and board-certified professional. Every two years, he is required to complete license renewal applications. He has done so approximately fifteen times. He also completed a three-year residency in English, and has taken and passed oral and written tests for Board certification in English. Appellant speaks English in his medical practice— both in treating patients and conversing with colleagues.

The ALJ similarly discredited appellant's argument that his disclosure of the malpractice claims on his FMH application indicates that his failure to disclose the *Wagner* case on the Board application was inadvertent. As the ALJ noted, "there are potential reasons why [appellant] might elect to disclose the existence of malpractice cases to the hospital where he regularly practices and might choose to refrain from disclosing such claims to the Board that issues initial licenses and grants license renewals to physicians in Maryland." In fact, the ALJ

---

**5.** Appellant does not explain his misunderstanding of the third question—Question 13.f.

found that the disclosures on the FMH application actually suggest that appellant's failure to disclose to the Board was intentional. The ALJ reasoned:

> The fact that [appellant] disclosed three malpractice cases on the FMH Application he filed six months earlier demonstrates that he was capable of reading carefully and responding accurately to questions concerning malpractice claims on an application form. Moreover, his recent submission to FMH of this medical staff reappointment application indicates that he should have been sensitive to and prepared for questions concerning recent and pending malpractice claims when completing his Board Application. Instead, his disparate filings to FMH and to the Board demonstrate that he was inconsistent and reckless in carrying out his professional reporting responsibilities.

The evidence supported the inferences drawn by the ALJ. Based on the foregoing discussion, we conclude that substantial evidence supported the conclusion that appellant intended to make false statements on his license renewal application, and that his responses were neither accidental nor inadvertent.

### 4. Severity of Sanction

Finally, appellant adduces that, even if the Board was correct in its findings and conclusions, the sanction and penalty imposed on him were unreasonably severe. We note at the outset that, in reviewing the severity of administrative sanctions, we are confined to an extremely narrow standard of review. We must not revise a lawful administrative sanction that falls within the agency's authority unless the sanction is so extreme and egregious that it amounts to an arbitrary or capricious decision. *MTA v. King,* 369 Md. 274, 291, 799 A.2d 1246 (2002).

The Board's sanctions fell neatly within its authority. The Board has statutory authority under § 14–404(a) to "reprimand any licensee, place any licensee on probation, or suspend or revoke" a license if a physician violates any of its grounds

for discipline. Section 14–405.1 also authorizes the imposition of a fine in addition to a suspension.

The Board's justifications for its sanctions were neither arbitrary nor capricious. The Board noted:

It is the Board's responsibility to determine the importance of this information. It is [appellant's] responsibility to provide that information rather than attempt to conceal it from the Board by making willfully false representations. [Appellant's] violation is a serious and deliberate breach of the requirements placed on all physicians by the Medical Practice Act, and it deserves a serious sanction.

The Board further explained that placing appellant on probation was necessary "to supervise compliance with the requirement of the ethics course and in order to deter [appellant] and other physicians from this type of conduct in the future." Last, in affirming the ALJ's recommendation that a fine of $5,000 be imposed, the Board explained:

[I]n evaluating over 11,000 applications for renewal each year, [the Board] necessarily relies on the honesty and integrity of the physicians filling out the renewal form. [Appellant] by his willfully false statements attempted to conceal from the Board information potentially critical to the Board's evaluation of his qualifications for continued licensure. This improper conduct was willful, and the potential harm to the public in any such concealment is substantial.

Ultimately, we find that the sanctions in this case were not extreme or egregious, and the Board's reasons for imposing them were neither arbitrary nor capricious.

**JUDGMENT AFFIRMED. COSTS TO BE PAID BY APPELLANT.**