Circuit Court for Baltimore City
Case No. 24-C-15-005164

REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 573

September Term, 2016

_____


KEVIN MIHAILOVICH

V.

DEPARTMENT OF HEALTH AND
MENTAL HYGIENE

_____

Woodward, C.J.,
Friedman,
Sharer, J. Frederick
    (Senior Judge, Specially Assigned),

JJ.

_____

Opinion by Sharer, J.

_____

Filed: September 28, 2017

In this appeal we shall resolve conflicting interpretations of the "five workdays" requirement of Maryland Code (1993, 2015 Repl. Vol.) State Personnel & Pensions, Section 11-106(c) ("SPP") as that term pertains to the disciplinary suspension of a State employee.

The issue before us, which we have recast, is:

Whether the Department of Health and Mental Hygiene ("DOH"), [1] appellee, gave timely notice of a suspension without pay to appellant, Kevin Mihailovich.[2]

We shall hold that the DOH did not give timely notice pursuant to the statute; hence, we shall reverse the judgment of the Circuit Court for Baltimore City.

## BACKGROUND

Although the circumstances of appellant's employment and asserted misconduct are not necessary for our review, we provide a brief factual recitation for procedural context.

Mihailovich is a Certified Nursing Assistant employed by the Thomas B. Finan Center, an in-patient psychiatric facility under the management of the DOH, located in Allegany County. On the evening of March 3, 2015, Finan Center management learned of an incident involving Mihailovich and a patient that resulted in injury to the patient requiring medical treatment at a local hospital. Management determined that Mihailovich

---

[1] The Department of Health and Mental Hygiene was renamed as the Department of Health effective July 1, 2017. We shall refer in the opinion to "the Department" or "DOH."

[2] As asserted in his brief, appellant posits:
1. The ALJ Correctly Concluded That The Department Violated SPP § 11-106 (c) By Not Suspending Mr. Mihailovich Within Five Workdays After The Appointing Authority Acquired Knowledge Of Alleged Misconduct.
2. The Circuit Court Erred In Reversing the ALJ.

engaged in "misconduct" by failing to follow DOH-approved de-escalation techniques. On the next day – March 4 – Mihailovich was placed on paid administrative leave pending an investigation into the incident. The administrative leave extended from March 4 through March 17, when Mihailovich was notified that he was to be suspended for 15 days without pay.

On March 30, 2015, Mihailovich noted a timely appeal to the Secretary of the Department of Budget and Management. Following an unsuccessful settlement conference, the case was forwarded to the Office of Administrative Hearings. On July 27, 2015, a merits hearing was conducted, following which, on September 9, 2015, the Administrative Law Judge (ALJ) issued a written decision reversing the suspension, and ordered back pay.

The DOH moved for reconsideration, challenging the ALJ's interpretation and application of SPP § 11-106(c), which was summarily denied. The DOH filed a request for judicial review of the ALJ's decision in the Circuit Court for Baltimore City. Following a hearing, the circuit court reversed the decision of the ALJ, thus reinstating the suspension.

## Standard of Review

Within the context of the present appeal, "[t]he decision of the Office of Administrative Hearings [was] the final administrative decision[,]" SPP § 11-110(d)(3), and not that of the DOH or the Secretary of the Department of Budget and Management. As the final adjudicator of contested DOH's disciplinary decisions, the ALJ's review of those decisions, "is bound by any agency regulation, declaratory ruling, prior adjudication,

2

or other settled, preexisting policy, to the same extent as the agency is or would have been bound if it were hearing the case." SG § 10-214(b). *See also* SPP § 11-110(c)(2).

It is "[b]ecause an appellate court reviews the agency decision under the same statutory standards as the circuit court," *Consumer Prot. Div. v. George*, 383 Md. 505, 512 (2004) (quotations and citation omitted), that "we analyze the agency's decision, not the [circuit] court's ruling." *Martin v. Allegany County Bd. of Educ.*, 212 Md. App. 596, 605 (2013) (citation omitted). We are "'limited to determining if there is substantial evidence in the record as a whole to support the agency's findings and conclusions, and to determine if the administrative decision is premised upon an erroneous conclusion of law.'" *W.R. Grace & Co. v. Swedo*, 439 Md. 441, 453 (2014) (quoting *Bd. of Physician Quality Assur. v. Banks*, 354 Md. 59, 67-68 (1999)).

In fact, "when the question before the agency involves one of statutory interpretation or an issue of law, our review is more expansive." *E. Outdoor Advert. Co. v. Mayor of Baltimore*, 146 Md. App. 283, 302 (2002) (quoting *Dep't of Labor, Licensing & Regulation v. Muddiman*, 120 Md. App. 725, 734 (1998)). As such, "it is always within our prerogative to determine whether an agency's conclusions of law are correct." *Hranicka v. Chesapeake Surgical, Ltd.*, 443 Md. 289, 298 (2015) (quotations and citation omitted). It is for this reason that we review the agency's statutory interpretation *de novo*. *See Ireton v. Chambers*, 229 Md. App. 149, 155 (2016) (citing *Gomez v. Jackson Hewitt, Inc.,* 427 Md. 128, 142 (2012)). *See also Fraternal Order of Police Montgomery Cty. Lodge 35 v. Montgomery Cty. Exec.,* 210 Md. App. 117, 128 (2013).

## DISCUSSION

This appeal requires us to review the ALJ's interpretation and application of SPP § 11-106(c), which provides, relevant to the issue presented:

> (1) An appointing authority[3] may suspend an employee without pay no later than 5 workdays following the close of the employee's next shift after the appointing authority acquires knowledge of the misconduct for which the suspension is imposed.

> (2) Saturdays, Sundays, legal holidays, and employee leave days are excluded in calculating the 5-workday period under this subsection.

When assessing the timeliness of the suspension, the ALJ was tasked with answering two underlying questions posed by Mihailovich: "[f]irst, what qualifies as a 'workday' under SPP section 11-106(c)[;] [a]nd second, what constitutes 'the employee's next shift' under that same provision when, as here, the appointing authority has placed the employee on administrative leave . . . [?]" The ALJ concluded that the term "workday" was intended to relate to the employee's schedule, rather than the appointing authority's schedule, and that the employee's next shift is not affected by being placed on administrative leave.

The ALJ found that, "[a]ssuming further that the Employee normally maintains a Wednesday-through-Sunday workweek, his next five workdays would have been: (1) Thursday, March 5; (2) Friday, March 6; (3) Saturday, March 7; (4) Sunday, March 8; and

---

[3] An appointing authority is "an individual or a unit of government that has the power to make appointments and terminate employment." SPP § 1-101(b).

4

(5) Wednesday, March 11."[4]  Based on that interpretation, the ALJ found the suspension imposed on March 17 to be untimely, reversed the suspension, and ordered back pay.

We address the first of these two questions in our review of the ALJ's decision and dispose of the second, accordingly.

## Statutory Interpretation

## By whose schedule is a "workday" determined?

Since the question presented in this appeal is based largely on the interpretation of SPP § 11-106(c), we look first to the plain meaning of the statute.

All "[l]egislation is created with a particular objective or purpose." *Bowers v. State*, 227 Md. App. 310, 322 (2016) (citation omitted).  As such, "[t]he cardinal rule of statutory construction is to effectuate and carry out legislative intent." *Duffy v. CBS Corp.*, 232 Md. App. 602, 612 (2017) (quoting *Rose v. Fox Pool Corp.*, 335 Md. 351, 358 (1994)), *cert. granted*, No. 41, Sept. Term, 2017 (Md. Sept. 12, 2017).

When this Court is "called upon to construe a particular statute, we begin our analysis with the statutory language itself since the words of the statute, construed according to their ordinary and natural import, are the primary source and most persuasive evidence of legislative intent." *Duffy*, 232 Md. App. at 613 (quoting *Rose*, 335 Md. at 359). However, "[w]here the statute's language is ambiguous or not clearly consistent with the statute's apparent purpose, the court 'search[es] for [the General Assembly's] intent in other indicia, including the history of the [statute] or other relevant sources intrinsic and

---

[4] The Thomas B. Finan Center is a "24/7" facility.

extrinsic to the legislative process[,]' in light of: (1) 'the structure of the statute'; (2) 'how [the statute] relates to other laws'; (3) the statute's 'general purpose'; and (4) '[the] relative rationality and legal effect of various competing constructions.'" *Hailes v. State*, 442 Md. 488, 495-96 (2015) (quoting *Gardner v. State*, 420 Md. 1, 9 (2011)). *See also Patton v. Wells Fargo Fin. Maryland, Inc*., 437 Md. 83, 97 (2014) ("Where, as here, there appears to be ambiguity or uncertain meaning in a statute, the Court 'may and often must consider other external manifestations or persuasive evidence, including a bill's title and function paragraphs, … its relationship to earlier and subsequent legislation, and other material that fairly bears on the fundamental issue of legislative purpose or goal[.]" (quoting *Kaczorowski v. Mayor of Baltimore*, 309 Md. 505, 515 (1987))). With this in mind, in our statutory interpretation inquiry, we will consider the "legislative history of [SPP § 11-106], including amendments that were considered and/or enacted as the statute passed through the Legislature," *Duffy*, 232 Md. App. at 614 (quoting *Rose*, 335 Md. at 360), as well as the related legislative documents and reports that were circulated during the pendency of the statute's enactment.

The parties agree that the ALJ erred in the manner in which the 5-workday period was counted. However, they disagree about the statutory meaning of "workday" – that is, whether workdays are to be counted from the perspective of the appointing authority or the employee. Mihailovich contends that "workday" refers to the appointing authority's schedule; DOH avers that it pertains to the employee's schedule. We have found no reported opinions of either this Court or the Court of Appeals that directly answer the question.

6

As a matter of first impression, we conclude that the "workday" specified in the statute pertains to the schedule of the appointing authority, not the employee, for the purpose of establishing the temporal parameters within which disciplinary action must be taken. We gather support for our conclusion from related case law and the statute's legislative history, as we shall discuss, *infra*.

In *W. Corr. Inst. v. Geiger*, 371 Md. 125 (2002), the Court of Appeals reviewed SPP § 11-106(c) in the context of the extent of "knowledge" necessary to trigger commencement of the 30-day period to impose a disciplinary action. 371 Md. 125. In its analysis, the Court considered the statute as a whole, noting that:

> All three subsections of § 11–106 are interrelated; one can not be read and interpreted without reading and interpreting the others. Subsection (a) prescribes what must be done before imposing discipline, subsection (b) sets the general time limitation on when the imposition of discipline must occur and subsection (c) provides a special time limit for suspensions without pay.

*Id*. at 143–44.

Although the Court's discussion in *Geiger* does not specifically answer the subsection (c) "workday" question presented by this appeal, the Court opined that "[s]ection 11–106 . . . is not person specific; it is situation and fact based." *Id.* at 144. Additionally, the *Geiger* Court stated that "the knowledge that triggers the running of the thirty day period need not, and may not, although it generally will, identify the employee ultimately disciplined." *Id.* In conclusion, the Court held that, "viewed in context, § 11–106 gives the appointing authority 30 days to conduct an investigation, meet with the employee the investigation identifies as culpable, consider any mitigating circumstances,

7

determine the appropriate action and give notice to the employee of the disciplinary action taken." *Id.* at 144–45.

As we discussed in *White v. Workers' Comp. Comm'n*, 161 Md. App. 483 (2005), the same interpretation is applicable to the more stringent temporal requirements of subsection (c). 161 Md. App. at 491. There, we held, "[t]he reasoning articulated in *Geiger* requires us to hold, *sub judice,* that any suspension imposed outside of the 5 work day time limit is violative of the statute and cannot stand." *Id.* Therefore, the appointing authority's knowledge of misconduct is the triggering factor to commence the calculation of the 5-workday period. It is important to note, however, that the issue presented in *White* did not require an analysis of the 5-workday notice requirement; rather, as in *Geiger*, it pertained to the degree of knowledge of misconduct that triggers the counting of those days. Additionally, because White's work schedule was Monday through Friday, inferably the same as the appointing authority, there was no need to address by whose schedule the 5-workday period is to be applied.

Adhering to *Geiger*, and considering the statute as a whole, we conclude that the term "workday" was intended to refer to that of the appointing authority for the purposes of calculating the 5-workday notice period. As the Court noted in *Geiger*, each of the subsections are related, and should be read as such. 371 Md. at 143-44. Specifically, subsection (a)[5] provides the requisite actions that an appointing authority must complete in order to take disciplinary action under either subsection (b) or (c). Subsections (b) and (c)

---

[5] Unless noted otherwise, discussion about subsections (a), (b), and (c) refer exclusively to SPP § 11-106.

both provide the timeframes within which the appointing authority must complete the actions in subsection (a) as a prerequisite to the imposition of a disciplinary action. Each subsection provides insight to the understanding of the others.

Of significance is the express language of the first clause in subsection (a): "[b]efore taking *any* disciplinary action related to employee misconduct . . . ." SPP § 11-106(a) (emphasis added). That language provides a strict limitation on the ability of an appointing authority to impose a disciplinary action, by prefacing any action with five prerequisites. In that regard, subsection (a) requires:

> [A]n appointing authority *shall*: (1) investigate the alleged misconduct; (2) meet with the employee; (3) consider any mitigating circumstances; (4) determine the appropriate disciplinary action, if any, to be imposed; and (5) give the employee a written notice of the disciplinary action to be taken and the employee's appeal rights.

*Id.* (emphasis added).

Subsection (b) then provides the time frame for imposing any disciplinary actions, other than an unpaid suspension, by limiting the period to "no later than 30 days after the appointing authority acquires knowledge of the misconduct for which the disciplinary action is imposed." SPP § 11-106(b). Subsection (c), on the other hand, addresses the significantly shorter time period within which to impose an unpaid suspension, by providing the limitation of "no later than 5 workdays." SPP § 11-106(c).

Our conclusion that the legislature intended "workday" to pertain to the appointing authority's schedule, not the employee's schedule, is supported by our consideration of the statute as a whole, then comparing the language of subsections (b) and (c). As we have noted, subsection (b) has no limitation on which days can be counted, or excluded from the

9

count, within the 30 day period. It is clear to us that the judicial interpretation that has been given to the 30-day requirements of 11-106(b) is that the 30-day investigatory period is measured in consecutive calendar days. It follows, then, that the 5-workday notice period of subsection (c) should likewise be measured in consecutive calendar days.

In contrast, subsection (c) provides, effectively, two additional restrictions beyond the disputed "workday" limitation. First, counting does not commence until after the end of the employee's next shift following the appointing authority's knowledge of misconduct. *See* SPP § 11-106(c)(1). Then, the succeeding provision expressly excludes weekends, legal holidays, and employee leave days from the calculation. SPP § 11-106(c)(2). Those two restrictions can be read in one of two ways; either, to put the focus on the employee's schedule, as DOH argues, or to allow the appointing authority more time to complete the requirements of subsection (a) by excluding days in which it would not be functioning, as well as the days the employee would be unavailable to meet.

Additional support for our interpretation is found by examining the statutory history and legislative resources utilized in the drafting and enactment of the statute. Particularly useful in our consideration is the 1996 Task Force to reform the State Personnel Management System's *Report to the Governor* ("*Governor's Report*" or "*Report*"), which was likewise discussed in part by the Court of Appeals in *Geiger*, as well as the ALJ in the instant case.

**Legislative History**

The General Assembly, in 1920, enacted Md. Code, Article 64A – Merit Systems, Section 17 of which provided, in pertinent part: "The appointing authority may for

10

disciplinary purposes suspend an employee[] [and] [e]very such suspension shall be without pay[.]" 1920 Md. Laws, ch.41. The ostensibly unrestricted original statute regarding disciplinary suspensions has since evolved, as legislative enactments are wont to do, into what is now codified as SPP § 11-106(c). Article 64 saw many amendments, reorganizations and recodifications when, in 1993, it was repealed and reenacted as the State Personnel and Pensions Article. In the reenacted article, the disciplinary suspensions provisions – then codified under Title 9 – added, for the first time, a time restriction on the imposition of a suspension. Section 9-403 – Suspension Period – provided:

> Except as otherwise provided in this section, a suspension for disciplinary purposes: (1) Shall be served on consecutive days; and (2) Shall begin within 2 workdays from the close of the employee's next shift after: (I) The alleged infraction occurred; or (II) The appointing authority learned of the alleged infraction.

1993 Md. Laws, ch. 10.

In 1994, that provision was further amended to substitute "2 workdays" for simply "2 days" and added a provision to allow an appointing authority five days for employees who are exempt from the Federal Fair Labor Standards Act overtime provisions. 1994 Md. Laws, ch. 466. The "workday" language was reinstated through the 1995 amendments with the introduction of the provision that excludes certain days from the calculation. 1995 Md. Laws, ch. 199. However, the current language of the disciplinary suspensions provisions of the statute did not appear in the statute until 1996.

The codification of the 1996 State Personnel and Pensions – Division I. – State Personnel code was the product of an extensive effort to reform the entire Maryland State Personnel Management System. SPP §§ 1-101, *et seq.* The legislation grew out of a

11

thorough investigation by the designated Task Force to Reform the State Personnel Management System that was established by Governor Parris N. Glendening by a June 1995 executive order, which charged the task force to design a "personnel management system that is more flexible, decentralizes personnel management functions, simplifies and streamlines personnel procedures and provides for the consistent application of personnel policies throughout a diverse State government." Exec. Order No. 01.01.1995.15, 46 (June 9, 1995).

The efforts of the Task Force resulted in the enactment of the State Personnel Management System Reform Act of 1996, through cross-filed House Bill 774 and Senate Bill 466, which rewrote and reorganized what are now the existing personnel management statutes.[6] *See* 1996 Md. Laws, ch. 347. In particular, the proposed legislation made significant changes to the statute governing disciplinary actions. *See* SPP §§ 11-101, *et seq*.

### 1996 Governor's Report

The 1996 Task Force to Reform the State Personnel Management System's *Report to the Governor* provides insight as to the legislative intent and support for our interpretation of "workday" under SPP § 11-106(c). Numerous references throughout the Report provide background to the enactment of the temporal limitations in SPP § 11-106 and demonstrate the intent to benefit both the employer and the employee.

---

[6] As noted in *Geiger*, the proposed legislation was passed and codified in substantially the same form as recommended in the Report. 371 Md. at 146.

The Highlights of Proposals Adopted by the Task Force – Disciplinary Process –
section of the Report addressed the time frame for imposing a disciplinary action and
recommended to "[i]ncrease[] the time allowed an appointing authority to investigate and
impose disciplinary suspension from two days to five days following the close of the
employee's next shift; allow[ing] an appointing authority up to thirty calendar days to
impose any other form of discipline." Task Force to Reform the State Personnel
Management System, *Report to the Governor*, vi (January 23, 1996).

The *Report* expresses the Task Force's rationale for extending the time allotted to
an appointing authority to act – that is, to expand the time parameters. That premise was
later reinforced in the *Highlights of the State Personnel Management System Reform Act
of 1996*, a comprehensive published guide to understanding the changes in the State
Personnel Management System as a result of the newly enacted Reform Act. Task Force
to Reform State Personnel, *Highlights of the State Personnel Management System Reform
Act of 1996* (May 8, 1997). In addressing the changes to the disciplinary appeal process,
it clarified that "[m]anagement has only five work days from the employee's last shift to
complete these tasks if a suspension without pay is to be imposed." *Highlights of the State
Personnel Management System Reform Act of 1996*, 13.

Finally, the *Report*'s Disciplinary Policy Proposal expressly outlined the proposed
legislation relating to Conduct-Related Discipline. That proposal became, in part, SPP §
11-106(c), and provided:

> After acquiring knowledge of alleged employee misconduct, an appointing
> authority shall have five (5) work days after the close of the employee's next
> shift after the alleged infraction occurred, or the appointing authority learned

of the alleged infraction, to impose a suspension without pay. Within that time period, the appointing authority must investigate; meet with the employee; consider mitigating circumstances and determine the duration of the suspension. Saturdays, Sundays, legal holidays, and employee leave days do not count when calculating the five work day period.

*Report to the Governor*, 44.

The proposed legislation included requisite actions an appointing authority must take before a disciplinary suspension can be imposed, which was ultimately codified separately under SPP § 11-106(a).[7]

In addition to the *Governor's Report* being circulated with the cross-filed Bills, the Department of Personnel submitted a written memorandum to the House Subcommittee on Personnel and the Deputy Legislative Officer, Richard A. Montgomery, III, and Acting Secretary of Personnel, Michael A. Glass, submitted written testimony before the Senate Finance and Budget and Taxation Committees ("Glass and Montgomery testimony"), in support of the proposed legislation. The memorandum and testimony each explain the key features of the proposed bill and the reasons for the proposed differences from the then-existing statutes.

In particular, the memorandum from the Department of Personnel emphasizes the biggest changes to the disciplinary actions provisions of SPP § 11-106, by stating that "[t]his provision provides for the first time that the appointing authority has to conduct its

---

[7] This language also effectively eliminated the distinction between employees who are exempt from the Federal Fair Labor Standards Act overtime provisions and those who are not, when calculating the timeframe for imposing disciplinary actions, as was apparent in the 1994 and 1995 versions of the statute.

investigation within a certain amount of time for all cases of discipline." *Geiger*, 371 Md. at 147. It goes further to explain that it

> imposes the general rule that the appointing authority has 30 days after acquiring knowledge of the misconduct to impose discipline. In cases where suspension is determined to be the appropriate penalty, the appointing authority has 5 work days following the close of business after the employee's next shift after acquiring knowledge to impose the suspension.

*Id.*

The written testimony by Glass and Montgomery provides a more detailed explanation of the changes to the statute. Glass and Montgomery Testimony, Senate Fin. and Budget and Tax. Comms. (1996). The first noteworthy section of the written testimony addresses the proposed definitions and general provisions subtitles of Title 1, in which it "[d]efines a day to mean a calendar day to eliminate confusion as to whether holidays and leave days are to be considered in calculating time limits."[8] Glass and Montgomery Testimony, 2. When viewing this definition in the context of the current SPP § 11-106(c), it is apparent that clarification was necessary to implement the express limitation of which days are to be counted, or excluded, under this provision of the statute.

The second section of import is the discussion of subtitle 1 – Disciplinary Actions – of Title 11, which distinguishes the two types of disciplinary actions as conduct-related and performance-related. The dialogue about conduct-related discipline, as relevant here, provides that "[i]n cases of conduct related discipline, the proposal establishes a uniform

---

[8] The definition of a day has been codified under SPP § 1-201, with slight modification, providing that "[u]nless specifically provided otherwise, in this Division I of this article a reference to a 'day' or 'days' means a calendar day or calendar days."

15

30 day time period in which management may investigate, meet with the employee, and impose discipline with one exception: to impose a disciplinary suspension, the appointing authority must act within 5 workdays." *Id.* at 19.

As to conduct-related discipline, the testimony outlines the three step process for imposition of discipline by an appointing authority and the sequence of appeal rights of the employee. The first step addresses the appointing authority's obligations, providing that "the appointing authority will determine the appropriate disciplinary action[,] [however,] [t]he appointing authority must first meet [sic] investigate the alleged misconduct, meet with the employee, and consider any mitigating evidence." *Id*. at 18.

In short, we glean the intent of the legislature to have "workday" pertain to the appointing authority's schedule. It is manifest throughout the extensive commentary that such was intended in the proposed bills which, as we have noted, were cross-filed.

**The Parties' Arguments**

With that background, we address the respective positions taken by the parties.

It is undisputed that the incident resulting in Mihailovich's suspension occurred in the evening on March 3, 2015 and that management, as the appointing authority, was immediately made aware of the situation, thus starting the clock. It is also undisputed that, pursuant to SPP 11-106, the commencement of the 5-workday counting period was to begin on March 5, the day following the end of Mihailovich's next shift on March 4. The point of contention rests solely in how the remaining four days are to be counted.

Mihailovich averred that, although the ALJ erred in counting the employee's workdays and in counting days that are expressly required to be excluded, the same result

16

would have been reached had the count, and the statute, been properly interpreted and applied. He asserts that the "workdays" to be counted are those of the appointing authority. His construction of the counting requirement of the statute is that the days ought to have been counted as follows: (1) Thursday, March 5; (2) Friday, March 6; (exclude Saturday, March 7 and Sunday, March 8); (3) Monday, March 9; (4) Tuesday, March 10; (exclude Wednesday, March 11 as an employee holiday/leave day); and (5) Thursday, March 12. Thus, he concludes, the suspension should have been imposed no later than March 12; and, it having been ordered on March 17, was five days beyond the 5-workday limit. Mihailovich supported his interpretation by reference to the *Governor's Report*, as we have discussed. He proffered that the explanations in the *Report* focus on the appointing authority's timeframe in which to act, thereby concluding that it is the appointing authority's workday that is to be counted.

We agree, as discussed above, and find his calculation to be an accurate reflection of which days were to be counted – or excluded – had the ALJ properly interpreted and applied the statute.

Mihailovich also highlights the statutory reference to "workday" rather than "employee shift" or "employee workday." He elaborated on this point by concluding that the only logical reason for the statutory reference to the employee's work shifts, is the intent that it be the triggering event to start the calculation. He argues that the purpose was so the 5-workday calculation does not commence until the day following the end of the employee's next shift, not the employee's current shift, thereby providing the appointing authority the use of the next full day to initiate the subsection (a) requirements. He further

17

claimed that the legislature's failure to include the term "employee shift" or distinguish "workday" from "employee workday" anywhere within the statute, further demonstrates the limited purpose for that language was to extend the time allotted for the appointing authority to act.

The DOH, however, argues that the same provision that commences the calculation "following the close of the employee's next shift," places emphasis on the employee's schedule. *See* SPP § 11-106(c)(1). Further, the DOH points out that the succeeding provision expressly excludes employee leave days. *See* SPP § 11-106(c)(2). Thus, when an employee is on leave, that day should not be counted. The DOH also presented an alternative argument that since Mihailovich was immediately placed on paid administrative leave following the incident, those days should be excluded as "employee leave" days, as required for the 5-workday calculation.[9]

The ALJ also utilized the *Governor's Report* in analyzing the statute. However, contrary to Mihailovich's understanding, and ours, the ALJ determined that the 5-day count should be based on the employee's workdays. Compounding that error, the ALJ also erroneously counted Saturdays and Sundays as well as the employee holiday of Wednesday, March 11.[10] Such days are expressly required to be excluded from the count

---

[9] Because we find that the "workday" referenced in SPP § 11-106(c) pertains to that of the appointing authority, we need not address the Department's alternative argument.

[10] According to the record, Mihailovich had utilized either compensatory holiday leave time or employee leave on March 11, 2015, as allowed under SPP § 9-205(a)(1). *See also* COMAR 17.04.11.08.

18

under the statute. *See* § 11-106(c)(2). Those errors resulted in the ALJ's finding that the fifth day to be counted was Wednesday, March 11. However, the ALJ then appears to have added a sixth day by concluding, without explanation, that "[five] workdays following the close of the Employee's shift on Wednesday, March 4, would have been 11 p.m. on Thursday, March 12, 2015." (internal quotation marks omitted). Accordingly, we conclude that the ALJ erred in the interpretation of "workday" and its application of the statute.

Hence, we hold that, under SPP § 11-106(c), once the appointing authority acquires knowledge of employee misconduct, it has five of the agency workdays to investigate, meet with the employee in question, consider any mitigating factors, determine the appropriate disciplinary action, and give written notice of the suspension and appeal rights, to the employee. The 5-workday period commences on the day following the end of the employee's next shift after the appointing authority acquires knowledge of the misconduct. The days to be excluded from the calculation are Saturdays, Sundays, employee leave days, and legal holidays as recognized by Maryland law. As in the case of the Thomas B. Finan Center, and other "24/7" agencies, the 5-day count would be five consecutive calendar days, subject to any such statutory exclusions.

Notwithstanding the ALJ's misinterpretation and misapplication of the statute, the determination that the DOH failed to timely impose an unpaid suspension was correct. Therefore, we reverse the order of the circuit court and remand with instructions that the circuit court issue an order affirming the ALJ's decision on grounds consistent with this opinion.

19

**JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE CITY REVERSED; CASE REMANDED TO THAT COURT FOR THE ENTRY OF AN ORDER CONSISTENT WITH THIS OPINION. COSTS ASSESSED TO THE MAYOR AND CITY COUNCIL OF BALTIMORE.**